# UNITED STATES *v.* McDOUGALL'S ADMINISTRATOR.

## APPEAL FROM THE COURT OF CLAIMS.

Submitted January 7, 1887. — Decided March 28, 1887.

The fact that Congress, by several special acts, has made provision for the payment of several claims, part of a class of claims upon which the respective claimants could not have recovered in an action in the Court of Claims in the exercise of its general jurisdiction, furnishes no reason for holding the United States liable in an action in that court for the recovery of such a claim which Congress has made no provision for.

The fact that the Court of Claims has rendered judgment against the United States at various times upon claims of a particular class, from which judgments the Executive Department of the Government took no appeal, furnishes no reason why judgment should be given against the

United States in an action in the Court of Claims on another claim of the class, if the United States are not otherwise liable therefor.

No statute of the United States, either in express terms or by implication, authorized the Executive in holding treaties with the Indians to make contracts of the character sued on in this action.

No officer of the government is authorized to so bind the United States by contracts for the subsistence of Indians not based upon appropriations made by Congress, that a judgment may be given against them in the Court of Claims in the exercise of its general jurisdiction; and this rule is not affected by the fact that the United States were greatly benefited by the contracts.

No opinion is expressed upon the point whether a claim presented to an Executive Department, after the expiration of the period within which it would have been cognizable by the Court of Claims, (had suit been brought thereon without first filing it in the Department), and by the Department referred to the Court of Claims under the provisions of Rev. Stat. § 1063, is barred by the statute regulating the limitation of suits in that court.

THIS was an appeal from a judgment rendered by the Court of Claims against the United States in favor of the appellee as administrator of the estate of George McDougall, deceased. The Court of Claims made the following finding of facts:

I. This claim has been pending in the Interior Department and before Congress for many years, but has never been finally disposed of.

II. Under the act of September 28, 1850 (9 Stat. 519), Redick McKee, George W. Barbour, and Oliver M. Wozencraft were duly appointed agents for the Indian tribes within the State of California. On October 9, 1850, Oliver M. Wozencraft, George W. Barbour, and Redick McKee were appointed commissioners "to hold treaties with the various Indian tribes in the State of California," as authorized by the act of 30th September, 1850. Upon the passage of the act February 27, 1851 (9 Stat. 586), they were informed that their offices and functions as commissioners were abrogated and annulled. They were at the same time directed not to suspend negotiations, but to enter upon their appointments as agents, and were as such designated under the act of 1851, to negotiate with the Indians of California, under the instructions already given.

The instructions referred to did not extend to and embrace

contracts for the subsistence of the Indian tribes, but only authorized such commissioners to hold treaties with such Indians.

III. Among the instructions given the said commissioners, under date of October 15, 1850, were the following:

"As set forth in the law creating the commission, and the letter of the Secretary of the Interior, the object of the government is to obtain all the information it can with reference to tribes of Indians within the boundaries of California, their manners, habits, customs, and extent of civilization, and to make such treaties and compacts with them as may seem just and proper.

"On the arrival of Mr. McKee and Mr. Barbour in California they will notify Mr. Wozencraft of their readiness to enter upon the duties of the mission. The board will convene, and after obtaining whatever light may be within its reach, will determine upon some rule of action most efficient in attaining the desired object, which is by all possible means to conciliate the good feelings of the Indians; and to get them to ratify those feelings by entering into written treaties, binding on them, towards the government and each other. You will be able to judge whether it is best for you to act in a body or separately in different parts of the Indian country."

Again on May 9, 1851, the Commissioner of Indian Affairs wrote to the commissioners, using the following words:

"What particular negotiations may be required it is impossible for this office to foresee; nor can it give any specific directions on the subject. Much must be left to the discretion of those to whom the business is immediately intrusted."

IV. When the commissioners arrived in California they found open hostilities existing between the Indians and the whites, and a general war had been agreed upon by the Indians. The governor of California had, at the request of Adam Johnston, the Indian agent, called out a portion of the militia of the state, and had organized a military force to operate against the Indians. To avoid the threatened, and quell the actual, hostilities, the commissioners at once began

to negotiate treaties with the Indians, by which they were required to leave their mountain resorts, to abandon their lands to the whites, to descend to the plains, and reside peaceably upon a tract of land selected for them. In return the commissioners promised the Indians that the United States would give them seeds to plant and implements to work with; establish schools, and appoint persons to teach them how to cultivate their lands and provide for their own wants.

V. The policy adopted by the commissioners included the "subsistence" of the Indians, and large quantities of beef and other provisions were stipulated for in the various treaties, and the office was notified that the same policy would have to be pursued throughout the whole state, and that this system was thought much better than the system of annuities. The letters in which these statements were made were written on May 1, 1851, and May 13, 1851.

On June 27, 1851, the Indian Office wrote to the commissioners, suggesting to them "that when the appropriation of $25,000 for holding treaties was exhausted, they should close their negotiations and proceed with the discharge of their duties as agents simply, as the Department could not feel itself justified in authorizing anticipated expenditures beyond the amount of the appropriation made by Congress."

On the 16th July, 1851, the office wrote to Barbour, one of the commissioners, saying: "In the copies of treaties made with the several Indian tribes heretofore transmitted to this office there are provisions for delivering them sundry articles in 1851, which cannot be complied with, as Congress will not be in session in time to make the necessary appropriations. Should you conclude other treaties, you will fix the time and payments, under any stipulation, at a period sufficiently in the future to allow of Congressional action to meet the requisitions;" and on the 9th July, 1851, the office wrote to Wozencraft, speaking of the "treaties you have concluded or may hereafter negotiate," and directing him to transmit in every case the estimate of money that will be required, &c. On August 9, 1851, after the Indian Office had notified the commissioners that the "appropriation for holding treaties," was exhausted.

the commissioner wrote to Redick McKee acknowledging the receipt of the joint letter of the commissioners, in which they stated that the policy of furnishing "subsistence must be pursued throughout the whole state;" and in this letter of acknowledgment he made no complaint and gave no advice or instruction to the contrary. And on September 15, 1851, he wrote to Wozencraft acknowledging copies of treaties "and return of expenditures, contracts, and disbursements."

On May 17, 1852, the Indian Office wrote Agents McKee and Wozencraft saying : ". . . I have therefore to request that, at the earliest practicable period, you make a full and detailed report directly to this office of all contracts, debts, and liabilities made and incurred by the agents of the Department in California."

Agent Wozencraft negotiated over one hundred treaties.

No disapproval or complaint of the actions of the commissioners, agents, or sub-agents, who were connected with the foregoing transactions, either by the President, Secretary of the Interior, or Commissioner of Indian Affairs, appears.

The agent, Wozencraft, without specific instructions so to do, made and entered into the following articles of agreement with the late George McDougall, who died May 14, 1872, and whose administrator now brings this suit : —

Articles of agreement entered into this fifth day of April, A.D. eighteen hundred and fifty-two, between O. M. Wozencraft, United States Indian agent for California, of the first part, and George McDougall of San Francisco, of the second part.

The said party of the first part agrees to contract with the party of the second part for two thousand and five hundred head of cattle, to be delivered as follows, viz., one thousand head to be delivered to Stephen Hutchinson, United States Indian trader, resident at San Gorgonia, for the Cohaulla tribe of Indians; five hundred head to be delivered to J. T. Ruckle, United States Indian trader, resident at Tamacula, and one thousand head to be delivered to the Indians at Aqua Callienti, near Womer's Ranche.

In consideration for which the party of the first part is to pay the party of the second part at the rate of twelve and one-half (12½) cents per pound (weight net), the weight to be estimated and agreed upon between the United States Indian traders and the party of the second part.

It is further understood that if there should be no appropriation by Congress this present session for the payment of this contract, then the parties of the second part are to receive fifteen and one-half cents per pound.

It is also further understood that one-half of the cattle contracted for may be "torones," at the option of the party of the second part; and it is further understood the cattle are to average five hundred pounds in weight each, if not, the weight to be made up by additional cattle, so that the original estimate may be complete.

It is further understood that the delivery of the cattle is to commence on the first of May next ensuing.

San Francisco, April 5, 1852.

O. M. WOZENCRAFT, [SEAL.]<br>
<em>U. S. Indian Agent.</em><br>
GEORGE McDOUGALL, [SEAL.]

Witness:

J. T. RUCKLE.

VII. In pursuance of this contract this decedent delivered to J. S. Ruckle and Stephen Hutchinson, United States Indian traders, one thousand head of cattle, averaging 650 pounds each, and took from them the following receipt:

Los ANGELES, <em>May</em> 17, 1852.

Received of George McDougall, the contracting party for supplying the "Cow-we-ha," "San Louis," and "Dieganian" tribes of Indians with beef cattle, one thousand head of cattle, averaging six hundred and fifty pounds weight each.

J. S. RUCKLE,<br>
<em>United States Indian Trader for the "San Louis"</em><br>
<em>Indians and "Dieganians."</em><br>
STEPHEN HUTCHINSON,<br>
<em>United States Indian Trader for the "Cow-we-has"</em><br>
<em>Tribe of Indians.</em>

The parties to whom the property was delivered were those nominated in the contract, and were licensed United States Indian traders, and the weight of the beef was agreed upon by the parties designated by the contracting parties, viz., McDougall and Ruckle & Hutchinson. It was customary, at this time, to estimate the weight of cattle, and not to sell them by actual weight.

The price for beef at that time is shown to have been frequently as high as twenty cents per pound, by wholesale.

VIII. Claims similar to the one at bar have been paid by the United States government as follows: John C. Fremont (10 Stats. p. 804), $183,025, with interest at ten per centum per annum from June 1, 1851; Samuel J. Hensley (12 Stat. p. 847), $96,576; Samuel Norris, $69,900 (2 C. Cls. 155); Fremont's case, $13,333.33 (2 C. Cls. 461); Fremont & Roache's case (4 C. Cls. 252), $46,666; Belt's case (15 C. Cls. 92). $10,715.19.

The drafts upon which Samuel Hensley recovered were drawn by Wozencraft upon the Secretary of the Interior, and were dated February 11, 1852, and the agreement under which the said drafts were drawn was dated February 10, 1852. The contract with Samuel Norris was made by same party on December 31, 1851. The contracts upon which Belt & Co. recovered were entered into between Belt and Sub-agent Johnston at various times from August 5, 1851, to January 31, 1852, and on August 12, 1851, the Interior Department approved "of the motive which prompted him (Agent Johnston) to furnish additional subsistence to the Indians," and informed him that an appropriation would be made.

Wozencraft reported the amount of the government's indebtedness to McDougall as amounting to $101,500.

IX. The Indians who were dispossessed of their lands under these treaty stipulations ceased their warfare and ever after remained peaceable, but never recovered possession of their lands, although the treaties were not ratified by the Senate, but the United States assumed title to said lands and disposed of them in the same manner as other portions of the public domain have been disposed of.

*Mr. Attorney General* and *Mr. Heber J. May* for appellant.

*Mr. James W. Denver* and *Mr. John Paul Jones* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

The only question discussed by counsel is as to the liability of the United States, under the written agreement between McDougall and Wozencraft of April 5, 1852, for the cattle delivered by the former. The argument in support of the judgment below proceeds mainly, if not altogether, upon the ground that the allowance by special acts of Congress of claims similar to the one here in suit, in connection with the failure or refusal of the proper officers to prosecute appeals from judgments in the Court of Claims against the United States upon contracts like the one in suit, constitute a sufficient basis, in law, for a recovery in this case.

Tracing the history of the claims referred to, we find that, by an act approved July 29, 1854, the Secretary of the Treasury was directed, out of any money not otherwise appropriated, to pay to John C. Fremont the sum of one hundred and eighty-three thousand eight hundred and twenty-five dollars, with interest at the rate of ten per cent. per annum from June 1, 1853, "in full of his account for beef delivered to Commissioner Barbour for the use of the Indians of California in 1851 and 1852." 10 Stat. 804.

In Hensley's case the Court of Claims delivered an opinion, which was transmitted to Congress February 2, 1850. H. R., 35th Cong., 2d Sess., R. C. Cls. No. 189. It is immaterial to the present inquiry that that court had no power at that time to give a judgment for money against the United States; for, if it had been then invested with all the jurisdiction it now has, the government would have succeeded. Its conclusion, upon the whole case, was that "the United States are not legally liable upon the contract claimed upon, because it was not made by their authority." At the same time the court disposed of McDougall's case — involving the identical claim presented in

this case—and held, upon the grounds stated in Hensley's suit, that the United States came under no legal liability to McDougall by reason of his agreement with Wozencraft, or of anything done under it. Congress, nevertheless, made provision, by special act of June 9, 1860, to pay Hensley's claim, 12 Stat. 847, but failed or refused to make an appropriation to pay McDougall.

Norris also sued upon a similar contract; but, for the reasons given in Hensley's case, his claim was also rejected. Congress, however, by joint resolution of June 22, 1866, referred that claim back to the Court of Claims " for examination *and allowance*," and directed " that in fixing the amount to be paid the claimant, the rule shall be the actual value of the supplies furnished at the times and places of delivery, of which due proof shall be made by the claimant." 14 Stat. 608. In obedience to that resolution, and not because of any change of opinion in the court as to the legal rights of Norris under his written agreement with Wozencraft, the Court of Claims gave judgment against the United States, at its December Term, 1866, for $69,900. *Norris* v. *United States*, 2 C. Cl. 155.

Subsequently, in *Fremont* v. *United States*, 2 C. Cl. 461, judgment was given against the United States upon one of this class of claims. That judgment did not proceed upon the ground that the claimant was entitled to recover if the case stood on the contract there in question—a contract similar to McDougall's—but upon the ground that the foregoing acts of Congress constituted a clear and distinct legislative recognition of the obligation of the United States to pay the fair value of the subsistence furnished for the Indians, as well under the contracts with Fremont, Hensley, and Norris, as under similar contracts with other parties. This decision was followed in *Fremont, &c.,* v. *United States*, 4 C. Cl. 252. Finally, in *Belt* v. *United States*, 15 C. Cl. 92, 106, upon a review of the circumstances connected with this class of claims, the court below adjudged that the United States were in law liable for the value of the subsistence furnished to Indians in California under the agreement there in suit, and which was similar to the

one of April 5, 1852, with McDougall. In none of the cases, in which judgments were rendered against the United States, were appeals prosecuted to this court.

The judgment in the present case was not accompanied by an opinion of the court below, for the reason, perhaps, that the claim of McDougall's administrator is covered by the decision in Belt's case. After a careful examination of the opinion in the latter case we are unable to find any solid ground upon which to hold the United States legally liable upon the agreement between Wozencraft and McDougall, or for the value of the cattle delivered under it. That Congress, by special acts, made provision for the payment of particular claims of the same class furnishes no ground whatever for the assumption that the government recognized its legal liability for the amount of such claims, much less for the amount of all other claims of like character. Such legislation may well furnish the basis for an appeal to the legislative department of the government to place all claimants, of the same class, upon an equality. But we are aware of no principle of law that would justify a court in treating the allowance by Congress of particular claims as a recognition by the government of its liability upon every demand of like character in the hands of claimants. We may properly take judicial notice of the fact that many claims against the United States cannot be enforced by suit, but provision for which may, and upon grounds of equity and justice ought to be, made by special legislation. But the discretion which Congress has in such matters would be very seriously trammelled, if the doctrine should be established, that it cannot appropriate money to pay particular claims, except at the risk of thereby recognizing the legal liability of the United States for the amount of other claims of the same general class.

The same considerations apply to the suggestion that the liability of the United States to McDougall's administrator, as upon contract, may arise from the failure or refusal of their law officers to prosecute appeals from judgments against the government in suits brought by other parties, holding similar claims. The question to be determined is, not whether the

representatives of the government have heretofore been guilty of neglect in not prosecuting such appeals, but whether, in the case in hand, the plaintiff has a valid claim in law against the United States.

Coming then to the inquiry whether the United States is legally liable on the contract between Wozencraft and Mc-Dougall, we are, met at the threshold by the fact, found by the court below, that although the instructions to Wozencraft and his colleagues did not extend to or embrace contracts for the subsistence of the Indian tribes in California, they yet pursued the policy of providing for such subsistence in advance of the ratification by the Senate of treaties made with those tribes.   That such a policy was, under all the circumstances, vital to the ends which those in charge of Indian affairs desired to accomplish, may be conceded under the facts found by the Court of Claims; and it may be that information of the proceedings of Wozencraft and his colleagues in making contracts for the supply of the Indians with provisions, beef, &c., and in all other respects, was given to the proper department at Washington, and that what they did was either approved or was not repudiated.   While all this may be admitted, the question comes back upon us, what statute, in express words or by necessary implication, invested Wozencraft with power to bind the United States by such a contract as that made with McDougall, even had he been previously directed or authorized by the Interior Department to make contracts of that character in holding treaties with the Indians?

It is suggested that such authority may be found in the act of June 30, 1834, 4 Stat. 735, c. 162, the 13th section of which provided that "all merchandise required by any Indian treaty for the Indians, payable after making of such treaty, shall be purchased under the direction of the Secretary of War [afterwards changed to Secretary of the Interior, 9 Stat. 395, c. 108, § 5], upon proposals to be received, to be based on notices previously to be given; and all merchandise required at the making of any Indian treaty shall be purchased under the orders of the commissioners, by such persons as they shall appoint, or by such persons as shall be designated by the

President for that purpose; and all other purchases on account of the Indians, and all payments to them of money or goods, shall be made by such person as the President shall designate for that purpose. . . . And the superintendent, agent, or sub-agent, together with such military officer as the President may direct, shall be present and certify to the delivery of all goods and money required to be paid or delivered to the Indians." The 7th section of the same act provides that "it shall be the general duty of Indian agents and sub-agents to manage and superintend the intercourse with the Indians within their respective agencies agreeably to law; to obey all legal instructions given to them by the Secretary of War [afterwards changed to Secretary of the Interior], the Commissioner of Indian Affairs, or the Superintendent of Indian Affairs, and to carry into effect such regulations as may be prescribed by the President." These statutory provisions, it is argued, conferred authority upon officers of the executive department to purchase, without limit as to amount, "merchandise required to the making of any Indian treaty," and invested the President, through others, with power as well to make "other purchases on account of the Indians," as to make "payments to them of money or goods."

This, in our judgment, is too broad a construction of the statute. Congress did not intend to invest the President or the head of a department, or any officer of the government, with unrestricted authority in the making of treaties with Indians, or in regulating intercourse with them, to purchase merchandise for them, or to make payments of money or goods to them. It appropriated certain sums to enable the President to hold treaties with the various Indian tribes in California. To the extent of such appropriations the President, through persons designated by him, could purchase merchandise, required in the making of a treaty, and could make payment of money or goods on account of the Indians. But no officer of the government was authorized to bind the United States by any contract for the subsistence of Indians not based upon appropriations made by Congress. It is not claimed that the agreement between Wozencraft and Mc-

Dougall was made with reference to such appropriations.    On the contrary, Wozencraft and his colleagues were informed by a communication from the Indian office, under date of June 27, 1851, that " when the appropriation of $25,000 for holding treaties was exhausted, they should close their negotiations and proceed with the discharge of their duties as agents simply, as the Department could not feel itself justified in authorizing anticipated expenditures beyond the amount of the appropriation made by Congress."    The findings show that when the written agreement with McDougall was made, Wozencraft and his colleagues knew that the appropriations had been exhausted.    Besides, the contract on its face shows that it was made with reference to appropriations to be thereafter made.    The parties evidently relied upon Congress recognizing the wisdom and necessity of the policy adopted for the pacification of the Indians in California, and, by legislation, supplying the want of authority upon the part of Wozencraft and his colleagues to contract, in behalf of the United States, for the subsistence of the Indians in advance of the ratification of the treaties negotiated with them.    That the policy pursued by Wozencraft and his colleagues was the only one that would have given peace to the inhabitants of California ; that the Indians were induced by the promises of subsistence held out to them to abandon their lands to the whites, and settle upon reservations selected for them ; and that the United States thereby acquired title to the lands so abandoned, are considerations to be addressed to Congress in support of a special appropriation to pay the claim of McDougall's administrator.    They do not, in our judgment, establish or tend to establish, a claim against the United States enforcible by suit.

It appears, from the finding of facts, that McDougall did not die until after the expiration of nearly twenty years from the time his claim accrued, nor until after more than nine years from the passage of the act giving jurisdiction to the Court of Claims of suits against the United States founded upon contract, express or implied.    It is stated that McDougall's claim was pending in the Interior Department at the time of his death in 1872.    When it was presented to that Department is not

stated. It may not have been so presented until after the expiration of the period within which it would have been cognizable by the Court of Claims, had suit been brought thereon without first filing the claim in the Department. Whether, in that event, the bar of limitation was removed by the mere fact that the claim was transmitted to the court below by the Interior Department, is a matter upon which we express no opinion. No such question is formally raised, and, in view of the conclusion reached, it is not necessary to determine it. We rest our decision solely upon the ground that the contract of April 5, 1882, imposed no legal obligation upon the United States.

*The judgment is reversed, with directions to dismiss the petition.*