MaddeN, Judge,
delivered the opinion of the court:
These suits were brought by the Cherokee Nation of Indians pursuant to a Special Act of Congress which is quoted in finding 1. That act confers jurisdiction upon this court to adjudicate claims of the plaintiff arising out of any treaty or agreement of the plaintiff with the United States, or any act of Congress, except claims heretofore “determined and adjudicated on their merits” by this court or the Supreme Court of the United States. Thus the dealings between the Cherokees and the United States from 1791 down to date, are open for examination in these suits. The plaintiff’s accountants have made an exhaustive examination of the pertinent records, and the plaintiff claims that the evidence obtained by this examination and presented to the court shows that the Government has not fulfilled its obligations to the Cherokees in many different and unrelated transactions. The Government denies that there has been any such failure, except in one instance. We consider, therefore, the several items of the plaintiff’s claims.
I.
Our findings 2 and 3 relate to the first item of the plaintiff’s claim. In 1794 the United States, in a treaty with the Cherokees, promised to furnish the Cherokees, annually, with goods to the value of $5,000. In 1798 it promised, in addition, to furnish them, annually, goods to the value of $1,000. These promises remained in force until 1835 when by another treaty, the annuities were commuted by a cash payment of $214,000. The Indians claim that the records do not show that the United States furnished goods to the extent promised in each of the years that the treaties were in force. In finding 3 we have found that, as to the amount of $12,-853.29, there is not satisfactory proof of payment.
The Government urges that it is not strange that records should be lacking or incomplete after a lapse of some 150 years, especially considering the somewhat primitive methods of keeping records which were current at the time in question. Because of what we say in the next paragraph, it is :not necessary for us to determine which party has the burden of proof on this item of the claim.
*757 In the last paragraph of finding 2 we have shown that Article VIII of the Treaty of August 6,1846 contained this language:
The United States agree to pay to the Cherokee nation * * * the further sum of twenty thousand dollars, in lieu of all claims of the Cherokee nation, as a nation, prior to the treaty of 1835, except all lands reserved, by treaties heretofore made, for school funds.
If, in fact, the United States had fallen short in its delivery of goods pursuant to the annuity provisions of the treaties of 1794 and 1798, this provision seems to have been a complete compromise and settlement of any claim for such deficiencies. No reason appears for our going behind that settlement. The plaintiff has, therefore, no right to recover on this item of its claim.
II.
Our findings 4, 5, 6, and 7 relate to a school fund which, under the Treaty of February 27, 1819, was to be set up for the Cherokees. In that treaty one described tract “twelve miles square” was ceded to the United States, to be sold by it and the proceeds invested in a school fund for the Cherokees. The United States caused the tract to be surveyed, and sold it in parcels, some as late as 1923. The plaintiff claims that the acreage sold and accounted for is only 89,111.94 acres, whereas a tract twelve miles square would contain 92,160 acres. Hence, the plaintiff says, the United States is short in its accounts as a trustee. But the tract was not a perfect square, since, as described in the cession, it was bounded on one side by the Tennessee River. Besides, two tributaries of that river flowed through the tract, and made unsalable some of its acreage. We do not know how many acres of salable land the tract contained, hence we do not find that the United States has accounted for less acres than were conveyed to it. The plaintiff says that three parcels of land, containing 1,742.94 acres were not sold, but should have been, and should be accounted for. We cannot determine from the evidence whether these three parcels passed into private ownership before or after the cession of the tract in 1819. If they were already in private ownership when the cession was made, the *758 United' States, as a grantee in trust, never became liable to account for them, since they did not pass to it by the cession, as they did not belong to the grantors, the Cherokees. We conclude, therefore, that there is no proved deficiency in the number of acres accounted for by the United States in the school fund tract.
The plaintiff complains that some of its school land funds were spent, during the period from 1863 to 1867, for the relief of destitute Indians of other tribes. See finding 7. During the war between the states, the Cherokee Nation entered into an alliance, “offensive and defensive” with the Confederacy, and many of its members took up arms against the United States. Many Cherokees who remained loyal to the United States were driven from their homes and became destitute. Congress in 1862, 1863, 1864 and 1865 provided for the postponement, if directed by the President, of appropriations to carry into effect the provisions of treaties with the unfriendly Indian tribes, and for the use of certain of such funds for the relief of refugee loyal Indians. In the administration of these acts the funds of one tribe were often used for the relief of refugees of other tribes. We have found that $669.05 of Cherokee funds were used for the relief of Wichita and Seminole Indians, and that $2,161.12 of Cherokee funds were used for the benefit of Indians of “tribes not designated.” We have also found that the money of other tribes was used for the relief of refugee Cherokees. Under the acts referred to above the Secretary of the Interior was required to report to Congress his action in the expenditure of the funds for the relief of refugee loyal Indians, and though his reports must have shown that the funds of the tribes were used for the relief of Indians not members of the tribe whose funds were used, Congress continued to include similar provisions in the later acts, thus, apparently approving the Secretary’s interpretation of the acts.[1] An amendment offered in the Senate which would have limited the expenditure of the funds of a hostile tribe to the relief of the members of that tribe was not accepted.[2] It would *759 seem, then, that the intent of the acts of Congress passed during the war period was to divert these funds of the hostile tribes to the relief of the loyal Indians. Congress had the power to so deal with the property of hostile tribes.
A Treaty was made July 19,1866,14 Stat. 799, between the United States and the Cherokees. Article XXXI of that treaty reaffirmed and declared to be in full force all provisions of former treaties, not inconsistent with that treaty, and provided that:
Nothing herein shall be construed as an acknowledgment by the United States, or as a relinquishment by the Cherokee Nation of any claims or demands under the guarantees of former treaties except as herein expressly provided.
We think that the expenditure of a part of the Cherokees’ funds for the relief of destitute loyal Indians of other tribes, while the Cherokees were in a state of hostility to the United States, did not, under the relevant acts of Congress and the Treaty of July 19, 1866, create any liability on the part of the United States to restore the amounts so expended to the Cherokees’ funds.
III.
Our finding 8 is that on June 30, 1891 the Secretary of the Interior withdrew $504.33 from the Cherokee school funds and returned it to the United States Treasury. The Government contends that because there is nothing in either of the plaintiff’s petitions in these cases relating to this claim, we should not consider it. The plaintiff urges that its prayer, in the last paragraph of its pétition in L-268, for an accounting, and for such other or additional amounts as the accounting may show, brings this claim within the scope of the petitions. But in the preceding paragraph, the plaintiff says that its accountants had worked on the accounts between the United States and the Cherokee Nation for four and one-half years before the petitions were written, “by reason of which work plaintiff has been able to present to this Court its claims in definite form, and with few exceptions has been able to make claim for specific or determinable amounts of money.” The plaintiff then says that the accounting prayed for “is intended *760 by plaintiff to be confined to a full and complete accounting of and on the several matters set up in this petition.”
In preparing its defense, the Government called upon its General Accounting Office to furnish it an accounting in response to the claims made in the plaintiff’s petitions. The preparation of such an accounting required several years’ work. We think it is not fair to the Government to ask for a judgment on the basis of an item which, on the face of the account, seems to indicate a liability on the part of the Gov-; ernment, but which might well be explained if studied by accountants aware that a claim was being based upon it. The only way to prevent this unfairness would be to remand the case for a further accounting. We are not willing to do this, in view of the time that has elapsed since these petitions were filed. We conclude that no recovery may be had upon the item contained in our finding 8.
IV.
The plaintiff claims $9,131.77, an amount deducted by the Secretary of the Interior from the gross proceeds of the so-called Strip Lands in Kansas which had belonged to the Cherokees but were, under the provisions of the Treaty of July 19, 1866, sold by the United States to settlers as public lands, and the proceeds invested in United States bonds as trust funds of the Cherokees. The Secretary’s deduction was for the expenses of the sale of the lands, consisting of 'advertising, expense of depositing, fees and commissions, and office expense. See finding 11. The Secretary also deducted $13,347.97 from the gross proceeds of the land as the cost of having the lands surveyed. The plaintiff makes no claim on account of this latter deduction. The Government justifies the contested deduction of the expenses of sale on the ground that it was acting as a trustee for the Cherokees in selling the lands for them and investing the proceeds for their benefit, and that therefore it should not have to pay, out of its own pocket, expenses necessarily incurred for their benefit. The Cherokees contend that the transaction was not merely for the benefit of the Indians, but was for the benefit of the United States in the arrangement of its political affairs and the opening of the lands to white settlers. They assert that *761 the express provision in the third paragraph of Article XVII of the Treaty of 1866, quoted in finding 9, “the expenses of survey and appraisement to be paid by the Secretary out of the proceeds of sale of said land” negatives any implication which might otherwise exist that all necessary expenses incident to the sale of the land should be borne by the beneficiary, the Cherokees. The quoted language does not seem to be a generally applicable provision in the treaty, but a part of a proviso relating to the sale of particular tracts to persons already settled upon them. We think, therefore, that the eccpressio unius argument is not applicable. If it were, it would prove much more than the plaintiff contends for, viz., that even the expenses of survey were not properly deductible, except in the particular cases covered by the proviso in which the quoted language appears. We find in the quoted language no dependable indication that the makers of the treaty intended the United States to bear the expenses of the sale of the lands.
In the absence of any showing of intention to the contrary, we think the United States had the usual right of a trustee and could reimburse itself out of the trust funds for its necessary out-of-pocket expenses in the administration of the trust. In addition, E. S. 2093 seems to provide expressly for the deduction of such expenses from the proceeds of the sale of such lands. It may be observed that by E. S. 2115 and 23 Stat. 76, 98, § 10, these expenses were made non-deductible after 1884.
The fact that the Cherokees accepted the Slade and Bender account, the story of which is recounted in findings 12 and 13, which account showed the deduction here complained of included in a combined deduction for “Expenses of survey and sale” (see finding 13) is some indication, not very strong, that the leaders of the Cherokees then thought that, under the Treaty of 1866, the Government was not bound to bear the expense of selling the land. The Government urges that the Slade and Bender account, and the facts relative thereto, are a complete bar to the plaintiff’s maintaining practically all of the claims asserted in these cases. We disagree, but defer discussion of this question to the end of this opinion.
*762 Y.
The plaintiff claims that it should have been paid interest on $48,389.46, the amount for which the United States sold some of the plaintiff’s lands to the Ponca Indians, from March 3, 1881, instead of from November 17, 1881. The facts are recited in finding 14. March 3 was the date on which Congress appropriated $50,000 for the purchase. November 17 was the date when the $48,389.46 was deposited in trust for the Cherokees in the Treasury. Presumably, by this time, the Poncas and the Cherokees had agreed on the price, but there is no proof as to when they agreed. The formal agreement between them ratifying the sale was dated June 14,1883.
We think that the appropriation, by Congress, of $50,000 for the purchase of the land from the Cherokees, did not entitle the Cherokees to interest until the purchase was in fact made and the price agreed on. The plaintiff may not recover on this item of its claim.
VI.
The United States, by agreement with the Cherokees, sold some of their lands to the Osage Tribe of Indians and agreed to put the proceeds of the sale into an interest-bearing trust fund for the Cherokees. The Cherokees claim that interest should have been paid them on the sale price of the lands, $1,099,137.41 from March 3, 1873, the date when Congress appropriated $1,650,600 “or so much thereof as might be necessary” to buy lands from the Cherokees for the Osages. This claim is not valid because the appropriation act expressly provided that interest should begin “whenever the amount to be so transferred shall be certified to the said Secretary of the Treasury by the Secretary of the Interior.” Finding 15; Act of March 3, 1873. The Government began to pay interest on the fund from June 12, 1873, and, since the act was specific in directing that interest be paid from the time of certification, we presume that June 12 was the date of certification.
The plaintiff further claims that the Government erroneously deducted $175,000 from the interest-bearing fund in *763 its first computation of interest. It did so because section 4 of the Act of February 14, 1873, quoted in finding 15, had, before the principal fund here involved had been appropriated to the Cherokees, appropriated $175,000 out of that fund for specific uses for the Cherokees which would remove that amount from their interest-bearing fund. The Government had in fact deducted $100,000 of this amount when it first computed the interest on the fund in June, 1873, and later retroactively deducted the other $75,000 as of the beginning, i. e., June 12,1873. The plaintiff claims that the $175,000 was not actually withdrawn from, the Treasury until considerably later, $80,000 of it on October 4, 18-73 and $95,000 on April 25,1874, and that therefore it should have been credited with interest on the basis of the amounts that were actually in the Treasury until those dates. The full sum was certified to the Secretary of the Treasury on June 12. We think the plaintiff was entitled, under the Act of March 3, 1873, to interest from June 12, 1873, the date of certification, until the dates when the amounts referred to were actually withdrawn from the principal fund.
The Government contends that the claim above discussed as to the interest on the $175,000 was not pleaded in the plaintiff’s petitions. We think this is true, in a strict sense, but that it is so closely related to the claims that were made in the petition in No. Jj-46 that the Government has not been put to any disadvantage in its accounting by the lack of more specific pleading. We have been able to work out from the evidence an accounting of the matters involved in this claim which, we think, is complete, hence we decide it on its merits.
The plaintiff claims that the $200,000 appropriated by Congress out of the principal fund here involved by section 13 of the Act of March 3,1875 (see finding 15), should have remained on interest until it was actually withdrawn from the fund on May 15, 1875. The Government stopped the interest on it on March 3, the date of the appropriation. We think the plaintiff should .have been credited with interest until May 15, for the reasons given above in connection with the $175,000 withdrawal.
The amount to which the plaintiff is entitled as a result of our decision on these items is $7,374.30.
*764 VII.
The plaintiff’s claims based upon the facts shown in our finding 17 are not, in our opinion, valid. They seem to be based upon an assumption that the Government is liable, to the beneficiary of an appropriation, for interest on the sum appropriated from the date of the appropriation to the date when the money is expended for or turned over to the beneficiary. This assumption is, of course, not correct. The Government is not liable for interest unless it has promised to pay it, or it is granted as a measure of just compensation for a past taking of property. Here the appropriation acts did not provide for interest. If the plaintiff has some notion that the Cherokee funds appropriated by the Acts of 1880, 1888, 1889, and 1893, referred to in finding 17, had been bearing interest before they were appropriated, it does not establish that fact by telling us what funds the money was in, or what interest it was earning before it was appropriated. The appropriation of $1,660,000 by the Act of March 2,1895, was in discharge of the Government’s interest bearing debt of that amount, and interest was paid on it until March 4, 1895, the date on which it was set up on the books of the United States as available for the purposes for which it was appropriated. Discussion of this problem occurs under heading VIII in this opinion.
VIII.
As shown in finding 18, the United States, by an agreement made with the Cherokees in 1891 and ratified by Congress in 1893, purchased from them a large tract of land in Oklahoma known as the Cherokee Outlet. The ratifying act appropriated $295,736 for the purchase and authorized the Secretary of the Interior to contract to pay $8,300,000 in addition. It provided that the latter sum should be payable in five equal annual installments the first to be due on March 4, 1895 and the last on March 4, 1899, “said deferred payments to bear interest at the rate of four per centum per annum, to be paid annually, and the amount required for the payment of interest as aforesaid is hereby appropriated.”
*765 The Act of March 2, 1895 appropriated $1,660,000 for the payment of the first of the five installments, due March 4, 1895 and said:
Provided, That said sum shall be held subject to the payment of the Delaware and Shawnee Indians and the Cherokee Freedmen as provided by the tenth section of said Act [March 3, 1893] to be available immediately after March fourth, eighteen hundred and ninety-five.
On March 4, 1895, the $1,660,000 was deposited in the Treasury to the credit of the Cherokees, and interest was stopped on that date. It was paid out as rights to it were established, the first payment on April 9, 1895 and the last on May 9,1921. Ninety-eight per cent of it was paid out in the first five years.
The plaintiff claims interest at 4% on undisbursed balances of this amount as those balances stood after each disbursement from 1895 to 1921. The Government contests the claim because not pleaded and also on its merits. The claim was not pleaded with particularity. However, all the relevant facts seem to be in evidence and we decide the claim on the merits. Congress provided in the Act of March 3,1893, for interest on each deferred installment until it was due, and it set the date of March 4, 1895, as the due date for the first installment. It also recognized that the Delawares, Shawnees, and Freedmen had, or might be held to have interests in the land which the Government was purchasing from the Cherokees, and provided that they should receive their pro rata share of the pay. When March 4, 1895, the due date for the first installment was at hand, it appropriated the money to pay it, but provided that this money should go, so iar as needed, to the three classes of owners other than the Cherokees, which classes had, apparently by that time been determined to be entitled to approximately one-fifth of the purchase price. The other four-fifths of the purchase price still bore interest, since it consisted of annual installments not yet due, but expressly carrying interest. A promise to pay interest, at the rate agreed to be paid upon the first installment before it was due, after it was due and had been made available to those who were to receive it as soon *766 as they showed their right to it, can not be spelled out of these statutes. The Cherokees did not own the right to this money after March 4, 1895,.except as to some undetermined amount which might remain after the Delawares, Shawnees and Freedmen had. been paid. It would have been impossible to compute interest on such an unascertained and unascertainable amount, and there was, so far as appears, no intent to do so.
IX.
Certain items of expenditure, listed in finding 19, and totaling $2,181.21, are claimed as improper by the plaintiff. These sums were spent in connection with the distribution to the Shawnees and the Cherokee Freedmen, of their proportionate part of the price paid by the United States for the purchase of the Cherokee Outlet. See finding 18, and the discussion in this opinion under heading VIII., s>upra. The expense of distributing these per capita payments was not properly payable from the fund distributed. The balance of that fund, after the persons other than the Cherokees had been paid, belonged to the Cherokees. Hence the charging of these expenses to the fund amounted to charging them to the Cherokee^. They should recover $2,181.21 on this claim.
X.
On the basis of the facts found in finding 20, the plaintiff is entitled, as the Government concedes, to $3,142, with interest at 5 percent from June 30, 1923, to the date of judgment herein. The total amount due, including interest, under this heading, is $6,523.11.
XI.
We have found in finding 21 that the Government charged various Cherokee funds, on various dates, all but five of which were between September 30,1862, and March 31, 1866, with various disbursements. We are not given the details concerning these charges, and must determine them on the basis of whether they appear, prima facie, to be proper or improper. Two charges for taxes on salaries, of $2.40 *767 and $47.75, appear to be improper. Likewise, charges totaling $1,039.46 for salaries of agents, expenses of operating agencies and board for agents, are not proper charges. Some of the other charges such as that for seeds for other tribes, and that for blankets for Creeks and Seminóles would appear to be improper except for the fact that they were made during the war period when Congress had authorized the use of funds for the relief of loyal Indians, not necessarily of the tribe whose funds were used. We have discussed this problem under heading II, above.
The Government should account for $1,089.61, on the claim shown in finding 21, with interest at 4 percent from the dates of disbursement to the date of judgment herein. The total amount due, including interest, under this heading, is $4,605.61.
We have computed the interest on these items, and those allowed under heading XII of this opinion, at 4 percent. The disbursements were from trust funds, but the plaintiff has not shown which trust funds they were from. We therefore compute interest at the lowest rate which any of the funds bore.
XII.
In our finding 22 appear two lists of disbursements made by the United States from interest due on Cherokee trust funds, which disbursements the plaintiff claims were illegal. All of the disbursements shown in the first list appear to be illegal except the first item, the fifth from the last, and the last three. The others are Indian Agency expenses which should not have been charged against the Indians’ funds. The first item, “Traveling expenses of Creeks and Seminóles,” may well have been a disbursement made in caring for loyal refugee Indians, and therefore proper, as we have said under ■ heading II, above. Since the claims shown in finding 22 were not pleaded with particularity in the plaintiff’s petitions, we will not presume that expenditures listed there were illegal, when they may have been legal, and the Government’s accountants were not put on notice by the petitions that any claim was based upon them.
The second list in finding 22 relates principally to disburse *768 ments for relief of refugee Indians during the war period. These items were not pleaded in the petitions. ■ They may well have been disbursements for loyal members of the tribes named, and we will not presume that they were illegal. The three items of “Pay of Miscellaneous employees” were expended for education, and were properly made from Indian funds.
The plaintiff is entitled to $1,111.77 with interest at-4 percent from the dates of disbursement to the date of judgment herein, on the items in the first list in finding 22, except the first, the fifth from the last, and the last three items. The total amount due, including interest, under this heading, is $4,556.49.
XIII.
In finding 28 we have listed a number of items which we have taken from the records which are in evidence and which correspond, for the most part, with claims asserted by the plaintiff in its proposed findings of fact. These claims are not pleaded in the petitions, hence, as we have said above, we will not presume that the disbursements were illegal, since the defendant had no reason to explain them in its accounting. Some of these items are obviously proper charges against Cherokee funds, and the others may have been proper. We therefore allow nothing on the items in finding 23.
XIY.
In finding 24 we have shown certain apparently un-expended balances from appropriations made for the Cherokees by appropriation acts recited in the findings. We have also shown certain sums returned to the Treasury as surplus, under these acts. These claims were not pleaded in the petitions, and hence no explanation of them is attempted in the Government’s accounting. We cannot, therefore, determine their validity, and the plaintiff cannot recover upon them.
XV.
In our discussion under heading IV., we postponed consideration of the effect of the Slade and Blender Beport and the *769 litigation following it. The relevant facts are recited in finding 12. It there appears that this court and the Supreme Court of the United States did not consider and adjudicate the merits of any of the claims involved in these suits. An examination of the reports of this court and the Supreme Court shows that two of the three members of this court who concurred in the judgment did not consider the merits even of the items which made up the balance which Slade and Bender found to be owing by the United States to the Cherokees. They held that the account, in the circumstances, was binding, regardless of its merits. 40 C. Cls. 252, 322-325, 328. Judge Peelle concurred in the judgment on the ground that the United States was indebted, on the merits, to the Cherokees in the amounts stated in the Slade and Bender Beport. Id. at 339. The Supreme Court of the United States affirmed the judgment of this court, on both grounds (202 U. S. 101).
Items not involved in the Slade and Bender accounting and, indeed, items which they may have considered and rejected on their merits, as they viewed them, were not sued for by the Cherokees in the suit referred to above. They were not adjudicated “on their merits” within the meaning which Congress must have intended to give this phrase in the jurisdictional act under which these suits were brought. We have, therefore, not regarded them as excluded from our consideration by the litigation which followed the Slade and Bender Beport.
The United States is indebted to the plaintiff in the amount of $25,240.72 which is the sum of the amounts shown under headings VI, IX, X, XI, and XII of this opinion.
OFFSETS
By the Act of August 12,1935, c. 508, § 2, 49 Stat. 571, 596, 25 U. S. C. 475a, the United States is given the right to have set off against any amount found due to an Indian Tribe “all sums expended gratuitously by the United States for the benefit of the said tribe or band”. In this case the report of the General Accounting Office under the 1935 Act, filed in this court September 22,1937, shows that the United States has made gratuitous expenditures of various sums for *770 the Cherokees. On page 53 of that report it is shown that, out of an appropriation of $400,000 made by the Act of April 22, 1932, 47 Stat. 107, for aid to the common schools in the Cherokee, Creek, Choctaw, Chickasaw, and Seminole Nations, and in the Quapaw Agency in Oklahoma, to be expended in the discretion of the Secretary of the Interior, $142,066.22 was spent during the fiscal year 1933 for “Aid of common schools” for the Cherokees.
We set off $25,240.72 of this expenditure of $142,066.22, gratuitously made for the benefit of the Cherokees, against the $25,240.72 which, we have held above, the United States owes the Cherokees. The liability being thus cancelled by the offset, the plaintiff cannot recover. For purposes of possible future accounting, there will remain, of the $142,066.22, after deducting the $25,240.72 used as an offset in this case, only $116,825.50.
The plaintiff’s petitions will be dismissed. It is so ordered.
Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.

 See Cong. Globe, 37th Cong., 2d sess., pp. 2093, 2098; id. 38th Cong., 1st sess., p. 2869, for manifestations in the debates of the attitude of Congress toward the hostile tribes.

 Cong. Globe, 37th Cong., 2d sess., pp. 2122 — 2124.