### SIOUX TRIBE OF INDIANS v. UNITED STATES.
### Nos. C–531(18–24).

Court of Claims.
Feb. 4, 1946.

See also 64 F.Supp. 303.

Ralph H. Case, of Washington, D. C. (James S. Y. Ivins, of Washington, D. C., on the briefs), for plaintiff.

George T. Stormont, of Washington, D. C., and J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, JONES, WHITAKER, and MADDEN, Judges.

LITTLETON, Judge.

The act of March 2, 1889, 25 Stat. 888, divided the then existing Great Sioux Reservation into seven separate reservations (including the one for the Santee Sioux in Nebraska), and sec. 21 thereof directed the sale or disposition for the benefit of the Sioux Tribe of all land not included in such separate reservations or otherwise reserved. It also authorized in section 8 general allotments to the Sioux Indians on the several reservations and the issuance of patents therefor, and such allotments were made. Sec. 12 authorized the Secretary of Interior to negotiate with the tribes on the various reservations for the sale and release by the Indians and purchase by the United States, subject to approval by Congress, of reservation lands not allotted or otherwise reserved for public entry and sale by defendant. Art. 7 of the treaty of 1868, 15 Stat. 638, relating to elementary education, was continued in force by sec. 17 for twenty years after February 10, 1890. Further extensions of these educational provisions were made from year to year in certain subsequent acts. Sec. 17 also created a permanent fund by an advance of $3,000,000 for the Sioux Tribe with interest at 5 percent. This $3,000,000 and certain other expenditures under the act of 1889 were under secs. 17 and 22 thereof to be reimbursed to the United States. Sec. 19 provided that "all the provisions" of the treaty of 1868, "and the agreement * * * approved" February 28, 1877, 19 Stat. 254, "not in conflict with the provisions and requirements of this act, are hereby continued in force according to their tenor and limitation, anything in this act to the contrary notwithstanding." Sec. 22 provided that all money accruing from disposal of lands under that act should be used solely for repayment of reimbursable

items and the creation of a permanent interest-bearing trust fund. Sec. 26 provided that all expenses for surveying, platting, and disposal of lands opened to settlement should be borne by the Government. Sec. 28 provided that the provisions of the act should become effective only upon acceptance thereof and consent thereto by the different bands of the Sioux Nation of Indians in the manner and form (signing by three-fourths of the adult male Indians) prescribed by art. 12 of the treaty of 1868. Plaintiff duly accepted and consented to the act and it became effective, by Proclamation, February 10, 1890.

In the continuation and carrying out of the policies, purposes, and provisions of the treaty of 1868 and of the acts of February 28, 1877 and March 2, 1889, supra, the several acts of 1895, 1902, 1906, 1907, 1908, and 1910 (referred to in the findings) were enacted to provide for sale and disposition by the Government, as trustee, of certain unallotted reservation lands involved in six of the seven cases now under consideration, and for deposit of the net proceeds therefrom in trust funds, with certain provisions as to interest thereon, for the Indians concerned.

Case No. 21 (Crow Creek Reservation) involves a trust fund of $274,848.33 created under the act of March 2, 1895, from principal and interest paid to plaintiff by the United States in connection with the Crow Creek Reservation to carry out an agreement made with the Sioux Tribe to secure acceptance of the act of 1889.

The seven cases now under consideration (C–531 (18) to (24), inclusive, present nine claims, or issues, seven of which are involved in two or more of the cases. All claims made by the Sioux Tribe under treaties of 1851, 1868, and subsequent agreements and acts of Congress, except one claim made in the amended petition in Case 22, were originally included and set forth in a single petition filed under the jurisdictional act, 41 Stat. 738, which authorized the institution of suit within five years thereafter. Twenty-four separate amended petitions were subsequently filed in 1934, soon after completion by defendant and delivery to plaintiff of the accounting report required by the allegation of the original petition. The Indians of the Sioux Tribe, made plaintiffs in the original and amended petitions, consisted of the Sioux tribes or bands located on eight separate areas within the Great

Sioux Reservation known as the Rosebud, Pine Ridge, Cheyenne, Crow Creek, and Lower Brulé Reservations in South Dakota; the Standing Rock Reservation in North Dakota; the Santee Reservation in Nebraska, and the Fort Peck Reservation in Montana.

The defendant's accounting report of seven volumes extends and covers all transactions to June 30, 1925. It was prepared with respect to all questions raised by plaintiff in the original petition concerning its properties, monies, and other specific transactions between the tribe and the Government. It was completed and furnished to plaintiff April 19, 1932, and the original of the accounting report was filed by defendant on July 12, 1934 as evidence in the original case, 84 Ct. Cl. 16. In June, 1934, plaintiff, for convenience of preparation, trial, and decision, filed twenty-four separate amended petitions on the basis of the original petition and defendant's accounting report, separating therein the questions and facts involved in the several issues raised by the original petition. All these twenty-four cases have been tried and submitted, and, with exception of the seven here under consideration and C-531 (11) argued and submitted in October, 1945, on final accounting, they have all been finally decided.

The instant cases, which involve claims of plaintiff in behalf of the tribes or bands on six separate reservations, were tried and briefed separately, but since one or more of the questions presented in each case are involved in two or more other cases they are grouped herein for the purpose of decision.

The claims made herein by plaintiff and the cases in which such claims are involved are as follows:

The approximate amounts involved in the cases are as follows:

| Case: | Amount |
|---|---|
| 18 | $ 560,210.60 |
| 19 | 203,259.40 |
| 20 | 238,812.91 |
| 21 | 30,178.58 |
| 22 | 560,030.22 |
| 23 | 2,136,909.99 |
| 24 | 661,348.22 |
| Total | $4,390,749.92 |

1. The first claim involves $823,883.38 for alleged illegal charges, as detailed in the findings, made by defendant against trust funds for provisions (food-rations) furnished prior to July 1, 1925, to the Sioux tribes or bands, as follows:

| Case | Reservation | Amount |
|---|---|---|
| 18 | Rosebud | $324,530.12 |
| 19 | Rosebud | 82,135.03 |
| 21 | Crow Creek | 10,526.51 |
| 23 | Cheyenne River | 200,569.96 |
| 24 | Standing Rock | 206,121.76 |

These charges against plaintiff's trust funds, which are set forth in findings 9, 16, 31, 56, and 77, represent disbursements by defendant for necessary food rations for the subsistence of Sioux Indians who were unable to support themselves on the reservations mentioned, which were a part of the Great Sioux Reservation created and set apart as the sole and exclusive property of the Sioux Tribe by the treaty of April 29, 1868, 15 Stat. 635. The trust funds against which the charges for provisions were made and out of which the amounts above mentioned were disbursed were (except the trust fund of $274,848.33 in case 21) derived and created solely from the net proceeds and interest from the sale, pursuant to acts of Congress, of certain

| Claim | Cases in which involved | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. Illegal charges for Provisions (rations) | 18 | 19 | ....... | 21 | ........ | 2: | 24 |
| 2. Illegal charges for Agency Expense | 18 | 19 | ....... | 21 | ........ | 2: | 24 |
| 3. Unidentified expenditures as between Agency & Education | 18 | 19 | | | | | ....... |
| 4. Improper charges for Prizes at State Fair | 18 | ........ | | | | | 24 |
| 5. Improper charges for stock killed, account disease, and replaced | 18 | ........ | | | | | 24 |
| 6. Improper and unauthorized expenditures for bridges and public buildings | ........ | | 20 | | | 23 | ........ |
| 7. Just compensation for 34,664.62 acres of land taken by erroneous survey | ........ | | | | 22 | | ........ |
| 8. Shortages of $2,361.40 and $336.83 in deposits for school land granted to South Dakota | ........ | | | | | 23 | 24 |
| 9. Trust Fund balances on June 30, 1925, not accounted for thereafter | ........ | | 20 | 21 | 22 | 23 | 24 |

lands of plaintiff constituting parts of the several reservations. In connection with these sales, or prior thereto, the unsold and unreserved lands of the several reservations above mentioned were allotted to the Sioux Indians located and residing upon such reservations.

■ The trust fund in case 21 arose and was created under the following circumstances: Under the act of March 2, 1889, a commission was appointed to negotiate with the several bands of the Sioux Nation for the purpose of securing ratification and approval of that act by the Indians affected thereby. The Indians of the Crow Creek Reservation objected to the terms of the act for the reason that the area set aside for them in section 6 provided a very limited acreage and materially diminished the Crow Creek Reservation, or Agency, as it existed at that time under the treaty of April 29, 1868.

On behalf of the United States the commissioners agreed to and did recommend a consideration to be paid to the Indians of the Crow Creek Reservation in order to compensate them for the loss of land referred to and in order to secure the ratification of the act by the Indians of the Sioux Tribe. Acting upon this recommendation the Congress appropriated and paid $187,039 which, by the provisions of the act of March 2, 1895, 28 Stat. 876, drew interest at 4 percent per annum. This particular fund and interest of $87,809.33 thereon was the sole and exclusive property of the Sioux Indians of the Crow Creek Reservation.

■ Plaintiff contends in behalf of the tribes or bands concerned that the cost of furnishing provisions (rations) was an existing obligation of defendant which it had assumed under the provisions of the act of August 15, 1876, 19 Stat. 176, 192, the agreement of September 26, 1876, approved by the act of February 28, 1877, 19 Stat. 254. These acts and the agreement are set forth and referred to in findings 17, 18, 19, and 20, in case C–531 (7), Sioux Tribe of Indians v. United States, 97 Ct.Cl. 613.

We agree with plaintiff that these disbursements from and charges against trust funds created, as hereinabove stated, were illegal, and accordingly hold that plaintiff is entitled to recover the amounts claimed. The reasons which support this conclusion are fully set forth in the findings and the opinion in Sioux Tribe of Indians v. United States, (C–531 (7) supra, and need not be repeated in detail here. That case involved, among other things, the claim of plaintiff for just compensation with interest from 1877 amounting to approximately $739,116,256 for the alleged taking by the Government in violation of the 1868 treaty of valuable timber, agriculture, and gold-bearing lands consisting of 7,345,157 acres, known as the Black Hills area, and, in addition, plaintiff's hunting rights and privileges under said treaty on approximately 40,578,123 acres.

The Black Hills tract contained about 800 square miles of gold fields and about 3,000 square miles of valuable timber, agriculture, and grazing lands. During and prior to 1876 defendant had endeavored, without success, to obtain by purchase a cession of the Black Hills area and the hunting privileges. Art. 12 of the 1868 treaty provided that no cession would be valid "unless executed and signed by at least three fourths of all the adult male Indians." Up to 1876 plaintiff simply stood upon this provision and refused to consider the matter of ceding the Black Hills (finding 12, C–531 (7), supra). As a result the appropriation act of August 15, 1876, 19 Stat. 176, 192, which appropriated $1,000,000 for subsistence of the Indians of the Sioux Tribe for the fiscal year ending June 30, 1877 (the treaty provision for provisions having expired), contained a proviso that no portion thereof should be used and that, thereafter, no appropriation would be made for subsistence unless the tribe agreed to cede and relinquish to the Government its treaty title to the Black Hills tract of 7,345,157 acres and the treaty hunting privileges on other lands.

The history of the negotiations up to that time and those which subsequently followed shows, as set forth in art. 5 and other articles of the act of February 28, 1877, supra, that the Government, through the treaty commissioners, the President, and the Congress, agreed as consideration for the desired cessions to furnish at its expense, among other things, food for subsistence of the Indians until such time as the Indians by their industry and skill should, with the assistance of the Government, be able to support themselves. The exact language of art. 5, so far as material, was as follows: "In consideration of the foregoing cession of territory and rights, * * *

the United States does agree to provide all necessary aid to assist the said Indians in the work of civilization; to furnish to them schools and instruction in mechanical and agricultural arts, as provided for by the treaty of 1868. Also to provide the said Indians with subsistence consisting of a ration for each individual of a pound and a half of beef (or in lieu thereof, one-half pound of bacon), one-half pound of flour, and one-half pound of corn; and for every one hundred rations, four pounds of coffee, eight pounds of sugar, and three pounds of beans, or in lieu of said articles the equivalent thereof, in the discretion of the Commissioner of Indian Affairs. Such rations, or so much thereof as may be necessary, shall be continued until the Indians are able to support themselves. * * *"

Art. 10 provided for the taking of an annual census.

In a conference in Washington on June 3, 1875, with a delegation of chiefs and headmen of the Sioux Tribe concerning the desired cessions, the President advised plaintiff, among other things, that many Indians who had earlier accepted what the Government proposed to the Sioux were living in houses, had farms and schools, and had educated children, and stated that "What I want to do is to prepare the Indian for a contingency that will be sure to arise, so that he will be able to live upon the ground and get a support from it; the same as white people do."

Further negotiations were subsequently had with plaintiff by commissioners appointed by the President who submitted to plaintiff tribe, after various councils with them, the cession agreement, 19 Stat. 254, containing the provision for aid and assistance in work of civilization and for subsistence, above-quoted (finding 12, C–531 (7), supra. However, less than one-tenth of the adult male Indians agreed thereto and signed it; the remaining nine-tenths refused to agree and sign. Their refusal was based upon the refusal of the Commissioners to agree to pay $70,000,000 for a lease of the Black Hills, and, also, the subsistence proposed so long as the tribe existed.

We held in C–531 (7) that the Government had authority in the circumstances to require plaintiff to sell to it the Black Hills land; that there had been a purchase rather than a taking in that the Government by the act of February 28, 1877, had fixed, as part of the purchase price therefor, an obligation of the Government to furnish aid and subsistence to the Indians until such time as they should with the assistance of the Government be able by their personal efforts to support themselves, and that under the terms of the jurisdictional act plaintiff was not entitled to recover since Congress had not authorized us to inquire into the adequacy of the consideration which the Government had agreed to pay and was continuing to pay for such land and hunting rights. The obligation which defendant thus assumed for subsistence is here sought to be made a charge against plaintiff's trust funds.

In the present cases counsel for defendant contend that there is no merit in plaintiff's first claim for restoration of the amounts charged for provisions for the reasons that by the above-quoted provision in art. 5 of the agreement and the act of 1877 the Government reserved to itself the determination of how many subsistence rations should be furnished at Government expense and the capacity of the Indians to support themselves; that the appropriation act of March 2, 1889, 25 Stat. 980, 992, contained a provision directing the Secretary of the Interior to take a census of the Indians of the Sioux Tribe "with a view of ascertaining how many of them are able to support themselves"; that the Indian appropriation acts for the fiscal years 1914 to 1918, 38 Stat. 99, 603, 1228; 39 Stat. 151, 987, appropriated certain sums for support of the Sioux Indians "other than the Rosebud, Cheyenne, and Standing Rock Tribes," and that the Indians of the tribes or bands involved in these seven cases had money of their own in the bank, i. e., the Treasury, and were therefore "able to support themselves."

We think the reasons given by defendant are not sufficient to establish and there is, otherwise, no proof to show that the obligation of the Government which it assumed in the act of 1877 to furnish subsistence had been fulfilled and discharged when Congress passed the acts of 1895, 1902, 1906, 1907, 1908, and 1910, pursuant to which the trust funds which took the place of reservation lands were derived and out of which the questioned disbursements for subsistence were made, or that such obligation had been discharged prior to June 30, 1925. The history, nature, and extent of, as well as the reasons for, the undertak-

ing of the Government as set forth in the act of 1877, as it was intended and understood by both parties, show that this was an obligation for subsistence which the Government could not fulfill and discharge in whole or in part, as counsel seem to infer, by the simple method of ordering the sale or disposition of other reservation lands of plaintiff and the use of the proceeds therefrom to provide the subsistence contemplated by the agreement and the act of 1877. To hold on the evidence of record that plaintiff may not recover the amount of $823,883.38 disbursed from its trust funds for subsistence (provisions) would be saying that the Government could under the act of 1877 use plaintiff's lands, properties, and moneys to pay plaintiff the purchase price for 7,347,157 acres of valuable land and hunting rights on other lands acquired from plaintiff by the Government. We think the act of 1877, which constituted a binding agreement, did not so intend. Congress appears to have taken the same view as shown by the provision in the appropriation act of March 2, supra, as follows: "For subsistence of the Sioux, and for purposes of their civilization, as per agreement ratified by act of Congress approved February twenty-eighth, eighteen hundred and seventy-seven, nine hundred thousand dollars: Provided, That this sum shall include transportation of supplies from the termination of railroad or steamboat transportation; and in this service Indians shall be employed wherever practicable: And provided further, That the Secretary of the Interior shall cause a census of the Sioux tribe of Indians to be carefully taken by a special agent, to be appointed for such purpose, with a view of ascertaining how many of them are able to support themselves, and, in ascertaining this fact, their physical capacity to work the land owned or occupied by them, either individually or collectively, the value of the land, its nearness to market, and general productiveness shall be considered, and such other facts and circumstances as will aid Congress in determining how many of such Indians are capable of self support: And provided, That the expenses incident to the taking of such census shall be paid from the money hereby appropriated;"

Similar provisions, except as to the special census, were contained in subsequent appropriation acts.

■ The evidence in these cases is sufficient to show that the Indians of the bands on the reservations here involved, for whom the challenged disbursements were made, were not "able to support themselves" within the meaning of art. 5 of the act of 1877; and there is no substantial evidence that Congress has ever made a determination to the contrary as to any of the Indians on such reservations. The mere failure to appropriate in some instances for subsistence, and the resulting use of trust funds for that purpose, does not prove and cannot be considered as sufficient evidence to establish that the obligation previously assumed to provide such subsistence had been fulfilled. The failure to pay a debt does not discharge the obligation therefor, nor may a trustee use the trust funds of his ward to pay his debt to such ward.

Plaintiff is entitled to recover a total of $823,883.38 consisting of the first item of the claims in cases 18, 19, 21, 23, and 24, as hereinbefore itemized.

2. The next item of plaintiff's claim which is involved in cases 18, 19, 21, 23, and 24, relates to alleged illegal disbursements from the trust funds for alleged agency expenses in certain amounts totaling $728,-037.86 [see tabulation on next page]. Plaintiff insists that these agency expenses were governmental and treaty obligations of defendant under the settled and long-established governmental Indian policy in the light of which the treaty of 1868, 15 Stat. 635, was made, and under the acts of February 28, 1877, 19 Stat. 254, and March 2, 1889, 25 Stat. 888, which constituted agreements between the parties. It is further insisted that the acts of 1895, 1902, 1906, 1907, 1908, and 1910, under which the trust funds from which these disbursements were made arose and were created, were in harmony with this view since none of these acts specifically provided for the use of the trust funds for the payment of these expenses which had always theretofore been paid from public funds as a treaty or governmental obligation. The purposes for which these disbursements for agency expenses were made and the amounts disbursed in each of the five cases above mentioned for each of the fifteen items of this claim were as follows:

| Nature of disbursement | Amounts in cases in which disbursed | | | | | Totals |
|---|---|---|---|---|---|---|
| | 18 | 19 | 21 | 23 | 24 | |
| Pay of Miscl. Agency employees ........................... | $134,059.81 | $72,592.94 | $10,247.99 | $129,249.09 | $100,430.86 | $446,580.69 |
| Incidental Agency expense.... | 1,060.47 | 299.35 | 147.92 | 1,660.10 | 2,417.80 | 5,585.64 |
| Agency buildings and repairs | 47,395.16 | 425.98 | 1,911.24 | 15,795.74 | 33,933.01 | 99,461.13 |
| Building material ............ | | | 513.99 | | | 513.99 |
| Traveling expense of agency employees ................... | 8,029.76 | | | 22,156.41 | 12,588.57 | 42,774.74 |
| Office equipment and supplies | 1,549.76 | 1,549.34 | | 2,583.53 | 6,017.94 | 11,700.57 |
| Pay of farmers .............. | 2,334.50 | 2,179.21 | | 16,542.37 | 18,785.98 | 39,842.06 |
| Telephoning and telegraphing | 703.72 | 376.86 | | 1,019.46 | 229.64 | 2,329.68 |
| Repairs to telephones and lines ...................... | | | | 20.76 | 154.33 | 175.09 |
| Automotive repairs and maintenance ..................... | 10,679.06 | 13,644.54 | | 12,441.87 | 27,330.59 | 64,096.06 |
| Automobiles ................... | 790.40 | 3,390.00 | | 3,493.90 | 5,887.49 | 13,561.79 |
| Motorcycles ................. | | | | 556.10 | | 556.10 |
| Motor Trucks ............... | 752.32 | | | | | 752.32 |
| Pay of Agent ................. | 108.00 | | | | | 108.00 |
| Totals ..................... | 207,462.96 | 94,458.22 | 12,821.14 | 205,519.33 | 207,776.21 | 728,037.86 |

The items and amounts shown in the tabulation are taken from the disbursements shown in findings 9, 16, 31, 56 and 77. The item "pay of farmers," totaling $39,842.06 in cases 18, 19, 23, and 24, is reserved for separate consideration and decision.

■ 'We agree with plaintiff's position that under the treaty and acts mentioned, the evidence submitted, and the established and long-continued governmental policy and practice in dealing with Indian tribes, as understood by the parties and intended by the treaty of 1868 and the subsequent agreements and acts of Congress, the disbursements for agency expenses in the total amount of $688,195.80 were not for purposes which constituted obligations of the Indians concerned, or for gratuities, but were for obligations of the defendant. The disbursements were therefore not legal or equitable charges against plaintiff's trust funds.

A study of the history of the relations and dealings over a period of 150 years between the United States and various Indian tribes and bands as disclosed in the numerous treaties, agreements, and acts of Congress dating back as early as 1785, shows that the Indian Tribes and the Government, in its capacity as a superior power and as the trustee or guardian for the Indians in the control and management of their affairs and property, have always considered, understood, and intended when entering into treaties and agreements and that the Government intended when enacting statutes relating to Indian affairs and property before as well as after the act of March 3, 1871, 16 Stat. 544, 566, that the costs and expenses of Indian agencies, the salaries and expenses of Indian commissioners, superintendents, agents, inspectors, and necessary miscellaneous agency employees were primarily governmental and treaty undertakings and obligations assumed by the United States in its sovereign capacity and as a party to such treaties and agreements. Since plaintiff has shown that the costs and expenses of Indian agents, agencies and agency employees are primarily governmental and treaty obligations, the burden of proof is upon the Government, when it claims the right to offset or charge against the Indians or their trust funds disbursements for the salaries and expenses of such agencies, to establish by satisfactory evidence what portions, if any, of the salaries and expenses of such agencies are proper legal and equitable charges or offsets as pure gratuities against the Indians, and the reasons why this is so.

A study of the treaty of 1868, 15 Stat. 635, and the agreements contained in the acts of February 28, 1877, and March 2, 1889, supra, involved in these cases, and the great number of similar treaties and agreements made with other Indian tribes from 1785 to date, under and in accordance with the same general and consistent governmental Indian policy, shows that all agency expenses such as are here involved were regarded by the parties as necessary and incidental to the discharge and fulfillment of the Government's obligations which

it had assumed to carry out the provisions of the treaty, agreements, and acts of Congress, to govern and protect the Indians who had agreed to place themselves under the care and protection of the Government; to give the promised aid and assistance in work of civilization; to enforce all laws and regulations of the United States, and to furnish the specified articles, provisions, and supplies.

In the case of Choctaw and Chickasaw Nations v. United States (finding 14), 88 Ct.Cl. 271, 283, and Seminole Nation v. United States (L-51 and L-208), 102 Ct.Cl. 565, 592–596, 622–632, we held that agency salaries and expenses were contemplated by the treaties there involved and were not legal or equitable offsets against an amount due the Indians as expenditures made by the Government "for the benefit of the Indians, including gratuities."

 The treaty of 1868 with plaintiff contemplated, as shown by its various provisions which were written in the light of the existing acts of Congress and the established Indian policy of the Government, that the Government would furnish an agency and an agent. This obligation was a continuing one and included any increased future duties and expenses of the agency necessary to enable the Government to carry out its various governmental and treaty obligations. The agency and agent mentioned in the treaty did not consist of merely one building and one employee if more should become necessary as was the case here. Treaties have not been and should not be so strictly construed as to such undertakings by the United States.

 Long before the making of the treaty of 1868 the United States had, as an established governmental Indian policy, Indian agents and agency employees, and such agents and employees were then and have always been regarded as officers and employees of the United States. They have always been so considered and referred to in acts of Congress, treaties, and agreements. We think the Indians assumed and understood and that they had a right to assume when making treaties that the existing policy and practice of the Government would be continued under the treaties as an obligation of the United States and would not be made a charge againt the Indians. As hereinafter shown, Indian agents are and always have been appointed by the President by and with the advice and consent of the Senate, and their salaries are fixed by statute as a public governmental expense. Appropriations have always been made for their pay as Government employees. In the early days prior to 1871, when the dealings between the Government and the Indian Tribes with reference to reservations and Indian properties were for the most part by treaties, the number of agents for the tribes and the necessary agency building and agency employees were not as large, or as extensive as they became in later years, but the duties and responsibilities of the agents and their employees remained substantially the same in substance under existing and subsequent treaties, agreements, and acts of Congress. The statutes dealing with the management and control of Indian properties and their affairs enacted after the act of March 3, 1871, 16 Stat. 544, 566, § 2079, R.S., 25 U.S.C.A. § 71, served the same purpose and had the same effect as treaties and agreements. Many of such acts, like the act of March 2, 1889, supra, became agreements between the Government and the Indians concerned. Chippewa Indians of Minnesota v. United States, 91 Ct.Cl. 97, 102.

Art. 1 of the 1868 treaty with plaintiff provided that if any white person or Indian should commit any wrong upon the person or property of the Indians the agent, upon proof, would cause the offender to be arrested and punished according to the laws of the United States.

Art. 2 defined the reservation for the sole and exclusive use and occupation of the Sioux Tribe, and provided that "the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, * * *." In art. 4 the United States agreed, at its expense, to construct a warehouse; a storeroom for the agent; an agency building for the residence of the agent; a residence for the physician, and five other buildings for a carpenter, farmer, blacksmith, miller and engineer.

Art. 5 provided for the agent, and art. 13 provided for the other employees mentioned. Art. 5 also provided that "The United States agrees that the agent for said Indians shall in the future make his

home at the agency building; that he shall reside among them, and keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, and also for the faithful discharge of other duties enjoined on him by law."

Art. 6 provided for allotments of land by the agent to individual Indians who wished to engage in farming. Art. 8 provided for instructions under the supervision of the agent to such Indians as had commenced farming. Art. 9 provided that the employees mentioned, except the agent, might be withdrawn in ten years, and that if so withdrawn $10,000 annually in lieu thereof would be paid for educational purposes. They were not withdrawn. It was found instead that several additional agents and employees were necessary to fulfill these and other obligations subsequently assumed by the United States.

Reference to a part of the history of the development and growth of the governmental Indian policy and practice as disclosed in some of the early acts of Congress and early treaties, in which acts and treaties that policy and practice were embodied and became well established in the early days and have long continued, will show the nature and extent of the sovereign as well as the treaty obligations assumed by the United States in its financial and property dealings and relations with Indian tribes, particularly with reference to Indian Agents and Agencies and the enforcement by governmental agents and employees of treaties, laws, and regulations.

In the act of August 7, 1789, 1 Stat. 49, the Secretary of War was directed and required to perform and to execute such duties as should be enjoined on or entrusted to him by the President relating to Indian Affairs; and on August 20 the amount of $20,000 was appropriated for "defraying the expense of negotiating and treating with the Indian Tribes." On and after passage of this act, and until the present time, the costs of agencies established and the salaries and expenses of officers, agents, and employees employed among Indian tribes have been generally regarded and treated as a part of the over-all governmental or treaty expenses of confining, governing, and protecting the Indians within certain areas and of governing and protecting citizens who might come into con-

tact with the Indians or acquire lands near them. The agents and agencies were as important to the whites and to the Government itself as they were to the Indians, and much more so in the early days when the Indians did not wish to be interfered with in their mode of life and negotiations were being had with them to obtain their agreement to remain permanently within restricted areas. However, as laws were enacted and treaties were made, Government officers, agents, and employees became more important to the Government as a necessary means of enabling it to perform its ever increasing governmental duties and obligations as well as its direct and incidental treaty undertakings and obligations. Such is the view, and we think the correct one, which we take of the origin and nature of Indian agencies and the work of agency officers and employees. We do not wish to be understood as saying that in more recent years, during which Congress has made large gratuitous appropriations and expenditures from public funds for the direct benefit and civilization of the Indians on their established reservations, such as for roads, irrigation projects, business enterprises, agricultural aid, and equipment and education, all the expenses of agencies and salaries of employees engaged specifically and entirely on the work of administering and carrying out these acts for the exclusive or primary benefit of the Indians would be or are governmental or treaty expenses not legally and equitably chargeable against the funds of the Indians or any sums thereafter determined to be due the Indians; but in view of the fact that primarily the agencies and their necessary expenses are obligations of the Government, the Government must prove by satisfactory evidence what portion, if any, of the salaries and expenses of such agencies should be charged against the funds or property of the particular Indian tribe concerned when it seeks to sustain its right to make such charges against Indian funds or to set up and claim such expenditures as offsets against an amount due the Indians concerned.

After adoption of the Constitution, and until 1871, the intercourse and dealings between the Government and the Indian Tribes were by acts of Congress under sec. 8, article 1, and by treaties under sec. 2 of Article 2 of the Constitution. Some treaties had been made prior to adoption of the Constitution. Until the establishment of the Department of the Interior by the act

of March 3, 1849, 9 Stat. 395, all matters relating to Indian affairs and the making of treaties with various Indian tribes were under the jurisdiction of the Secretary of War, subject to direction by Congress and the President.

The act of July 22, 1790, 1 Stat. 137, to regulate trade and intercourse with the Indian tribes, prohibited any person from carrying on any trade or intercourse with the Indians without a license for that purpose issued by the Superintendent of the Indian Department, and various officers and employees of the Government were appointed or designated for the purpose of carrying out and enforcing this act. Subsequently many other similar statutes were enacted and many treaties were made with various Indian tribes; and the number of officers and employees of the Government charged with the duty of carrying out and enforcing the provisions of those acts and treaties, as well as the regulations of the President, was increased from time to time, and they were provided with the necessary building facilities, equipment, and supplies for the performance of their duties among the Indian tribes at various places throughout the country. In statutes enacted and in the treaties made subsequent to the act of August 7, 1789, and to the present time, these officers and employees engaged in the administration and enforcement of laws, treaties and regulations, have been considered and recognized by the United States and the Indians as officers and employees of the Government; and the Agency facilities, equipment and supplies have likewise been regarded as obligations of the Government either as expenses necessary and incidental to fulfillment of the obligations assumed by the Government under treaties and acts of Congress, or as necessary and incidental governmental expenses in the discharge by the United States of the obligations assumed as a party to the various treaties or in its sovereign capacity as the guardian or trustee for the Indians, to protect them through the enforcement of all federal laws and regulations.

The officers and employees designated to carry out and enforce the act of 1790, supra, and the act of April 18, 1796, 1 Stat. 452, 453, which was continued in force until the year 1822, establishing Trading Houses with the Indian tribes, later came to be known as Indian agents and agency employees, and the Post facilities used by them later came to be known as the agencies. Many of these agents and agencies

were authorized, established and existed for many years among various Indian tribes long before and at the time treaties were made with them; that was true in the case of plaintiff tribe prior to the treaty of 1868.

The act of 1796, supra, authorized the President to appoint agents at each trading house established among the Indian Tribes and provided for the employment by such agents of clerks or other employees and prohibited such agents, their clerks and employees from being directly or indirectly concerned or interested in carrying on any business, trade, or commerce on their own, or any other than the public account; and provided that if any such person should offend against such prohibitions he should be guilty of a misdemeanor and forever be incapable of holding any office under the United States. In 1822, 3 Stat. 679, Congress abolished the Trading Houses and thereafter, as had been the case before, officers in the Military Service of the War Department, known as Indian agents and subagents, together with certain other employees, maintained posts or agencies at various places among the Indian tribes. This, for the most part, was true whether the tribes were, at the time, in treaty relation with the United States or not.

For many years after Congress began to provide for appointment by the President, by and with the advice and consent of the Senate, of civilian Indian agents and for the establishment of agencies among the Indian tribes, the President was authorized, when deemed advisable, to continue to use officers of the Army as Indian agents. In no instance has Congress even specifically made the cost of an agency or the salaries and expenses of the agents and employees thereof a charge against the Indians.

By the act of July 9, 1832, 4 Stat. 564, Congress provided for the appointment of a Commissioner of Indian Affairs who should, under direction of the President and agreeably to regulations made by him, have the direction and management of all Indian affairs, and of all matters arising out of Indian relations. He had supervision over Agencies, Indian agents and Agency employees and the various provisions of this act were to be enforced by the Superintendent of Indian Affairs authorized to be appointed thereunder and by the Indian agents and subagents.

The act of June 30, 1834, authorizing the organization of a Department of Indian

Affairs, 4 Stat. 735, provided in sec. 3 that the Superintendent of Indian Affairs should exercise a general supervision and control over the official conduct and acts of all officers and persons employed by the Government in the Indian Department under such regulations as should be established by the President. Indian superintendents, agents and agency employees came under this act. Sec. 4 provided for appointment of Indian agents by the President, by and with the advice and consent of the Senate, who should hold their offices for a term of four years, and fixed the annual compensation of such officers. Sec. 5 authorized the appointment by the President of subagents. Sec. 7, 25 U.S.C.A. §§ 31, 40, provided that the limits of each agency and subagency should be established by the Secretary of War, either by Indian tribes or by geographical boundaries; and that it should be the general duty of all Indian agents and subagents to manage and superintend the intercourse of the United States and its citizens with the Indians within their respective agencies, agreeably to law; to obey all instructions given to them by the Secretary of War, the Commissioner of Indian Affairs, or the Superintendent of Indian Affairs and to carry into effect such regulations as might be prescribed by the President. Sec. 10, 25 U.S.C.A. §§ 50, 54, 60, provided that the compensation prescribed for Indian agents, subagents, and their employees should be in full of all emoluments or allowances, but, where necessary, a reasonable allowance should be made for offices and office contingencies and traveling expenses. The policy and practice declared and established by the above-mentioned acts have been continued without material change in substance to the present time; and many treaties and agreements were made with various Indian tribes subsequent to the dates of the acts mentioned and in the light of their provisions and the duties being performed by Government officers, agents and employees.

Following the passage of the above-mentioned acts and similar statutes subsequently enacted, and the making of various treaties with Indian Tribes, Congress in the various acts making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaties with Indian Tribes has listed the appropriations made as to purpose and amounts under various headings, such as pay and expenses of Indian superintendents and Indian agents; agency buildings and repairs; interpreters and miscellaneous employees; traveling and other contingent expenses of Indian agents; pay of Indian inspectors and their necessary traveling expenses; fulfilling treaty stipulations (for annuities) with Indian Tribes; miscellaneous support of Indians; general incidental expenses of the Indian Service, and miscellaneous expenses of the Indian Department in the office of the Secretary of the Interior in the administration and management of Indian Affairs, both in Washington and in the field.

It appears that Congress has always regarded Indian agents, subagents, special agents, inspectors and agency employees as being officers and employees of the United States, and their pay and expenses and the cost of providing for and maintaining agency buildings, etc., as a governmental expense. These costs have never been treated in the appropriation acts as chargeable to the Indians or against the trust funds as obligations of the Indians by treaty or otherwise.

The earliest treaty provision we have found showing that from the beginning of intercourse and treaty relations between the United States and the Indian Tribes the Indian agents and Indian agencies were treated and regarded as governmental or treaty obligation and expense is in art. 5 of the treaty of September 17, 1778, 7 Stat. 13, between the United States and the Delaware Nation of Indians, as follows: "Whereas the confederation entered into by the Delaware nation and the United States, renders the first dependent on the latter for all the articles of clothing, utensils and implements of war, and it is judged not only reasonable, but indispensibly necessary, that the aforesaid Nation be supplied with such articles from time to time, as far as the United States may have it in their power, by a well-regulated trade, under the conduct of an intelligent, candid agent, with an adequate sallery [salary], one more influenced by the love of his country, and a constant attention to the duties of his department by promoting the common interest, than the sinister purposes of converting and binding all the duties of his office to his private emolument: Convinced of the necessity of such measures, the Commissioners of the United States, at the earnest solicitation of the deputies aforesaid, have engaged in behalf of the United States, that such a trade shall be afforded said nation, conducted on such

principals of mutual interest as the wisdom of the United States in Congress assembled shall think most conducive to adopt for their mutual convenience."

It seems apparent from what has been said above, without further reference to and citation of the many treaties subsequently made with various Indian Tribes and other acts of Congress and agreements, that the substance of the above-quoted provision in the treaty of 1778 with the Delaware Nation in reference to Indian agents and agencies was expressly or impliedly incorporated in the 1868 treaty with plaintiff, as well as in other and subsequent treaties and acts of Congress.

■ The courts have consistently held that Indian agents and agency employees are officers and employees of the United States. United States v. Birdsall, 233 U.S. 223, 227, 236, 34 S.Ct. 512, 58 L.Ed. 930; United States v. Fisher, 109 U.S. 143, 3 S.Ct. 154, 27 L.Ed. 885; Belknap v. United States, 150 U.S. 588, 14 S.Ct. 183, 37 L.Ed. 1191; United States v. Mullin, D.C., 71 F. 682, 687. See also United States v. Germaine, 99 U.S. 508, 25 L.Ed. 482.

■ In certain cases heretofore before the court prior to the cases of Choctaw and Chickasaw Nations v. United States (finding 14), 88 Ct.Cl. 271, 283, and Seminole Nation v. United States (L–51 and L–208), 102 Ct.Cl. 565, 592–595, 622–632, on the question of legal and equitable offsets, including gratuities, allowable to the Government against the Indians as deductions from such amount as was determined to be due the tribe concerned, the court, without full and adequate presentation and consideration of the historical origin and background of Indian agents and agencies, allowed as offsets in favor of the Government pay and expenses of Indian agents and all other agency expenses as nontreaty obligations of the Government and as gratuitous expenditures from public funds for the benefit of the Indians. See Blackfoot et al. Nations v. United States, 81 Ct.Cl. 101, 136, 137, 138; Shoshone Tribe of Indians v. United States, 82 Ct.Cl. 23 and 85 Ct.Cl. 331. However, a further study of the matter in the light of those treaties as they were evidently understood and intended by the parties, and in the light of their background and conditions existing at the time they were made, convinces us that salaries of agents, agency employees, agency expenses and transportation of treaty supplies and annuities were not proper legal and equitable charges or gratuities properly to be offset against the Indians. An expenditure by the Government, in order to be a gratuity or a legal or equitable offset chargeable against the Indians, must be one with respect to which the United States has not assumed any obligation, direct or incidental, as a party to the treaty or in its sovereign capacity pursuant to the intention of the treaty.

The treaties in the Blackfoot (1855) and Shoshone (1868) cases referred to and contemplated the continuance of agencies, agents, and employees which then and had theretofore existed among the tribes under and in accordance with the established governmental policy for the government of the Indians, the protection of white citizens, as well as the interests of the United States. Moreover, the express provisions of these treaties show that it was necessary for the Government to keep and maintain such agencies and agents in order that it might perform and fulfill the duties and obligations which it assumed under such treaties. Many of these treaty duties and obligations continued so long as the treaties remained in force, and they are still in force at the present time. Seminole Nation v. United States, supra. The Blackfoot et al. treaty, 11 Stat. 657, in contemplation that the Government would continue, as it had in the past, to provide the necessary agencies, agents, and employees and bear the expense thereof set forth in art. 7 that citizens of the United States might live in and pass unmolested through the countries (reservations) occupied by the several tribes and that "the United States is hereby bound to protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit." This was clearly a continuing obligation of the Government. In art. 8 the tribes consented and agreed that for the purpose of establishing thoroughfares through the reservations "and the better to enable the President to execute the provisions of this treaty" the United States might, within the reservations "construct roads of every description; establish lines of telegraph and military posts; use materials of every description * * *; build houses for agencies, missions, schools, farms, shops, mills, and stations for any other purpose for which they may be required," and use wood for fuel and land for grazing. Articles 9 and 10 provided for certain annuities in goods and provisions and for distribution

thereof by the United States to the Indians. Art. 11 stated that the "Tribes acknowledge their dependence on the government of the United States, and promise * * * to commit no depredations or other violence on such citizens." It was provided that should any one violate this pledge "and the fact be proved to the satisfaction of the President" compensation might be required out of Indian annuities. The tribes agreed to deliver the offender to the proper Government authorities. The tribes also agreed to "submit all matters of difference between themselves and other Indians to the government of the United States, through its agent, for adjustment, and will abide thereby." The provision concerning depredations against citizens was made applicable to depredations on other Indians, and the tribes agreed to deliver up the offender to the proper officers of the United States. Art. 12 provided for withholding of annuities if any tribe should violate the treaty. In art. 13 the tribes agreed that the United States should exclude ardent spirits and other intoxicating liquors from the reservations.

It will, therefore, be seen from the provisions of the Blackfoot treaty that the United States assumed, in addition to the undertakings specifically mentioned, the obligation of enforcing the federal laws and regulations within the reservations.

The treaty of 1868, 15 Stat. 673, with the Eastern Band of the Shoshone Tribe was made about two months after making of the Sioux treaty, and by the same Commissioners. The Shoshone treaty, like the Sioux treaty, provided for an agent, agency, etc., as an obligation of the United States, and the language of the treaty shows that the parties intended that the Agency should be permanent. Art. 1 of the Shoshone treaty required "the agent" to investigate and take proof as to any wrong or depredation committed by any one upon the person or property of an Indian or by any Indian upon the person or property of any one else. Art. 2, after providing that the reservation should belong to the tribe for its "absolute and undisturbed use and occupation," stipulated that "the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article * * *." In art. 3 the Government agreed to provide a warehouse and a residence for "the agent." In art. 4 the tribe agreed, when the agency buildings and agent had been provided, to make the reservation its permanent home. Art. 5 provided as follows: "The United States agrees that the agent for said Indians shall in the future make his home at the agency building on the Shoshonee reservation, but shall direct and supervise affairs on the Bannack reservation; and shall keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his finding, to the Commissioner of Indian Affairs, whose decision shall be binding on the parties to this treaty."

Art. 6 provided that the agent would make individual allotments of land to Indians who desired to commence farming, and that "Congress shall provide for protecting the rights of the Indian settlers in these improvements," and that "The United States may pass such laws * * * on all subjects connected with the government of the Indians on said reservations, and the internal police thereof, * * *."

These were all continuing obligations of the United States to be performed, on its behalf and on behalf of the Indians, by the Indian Agent and his force of government officers and agents as might become necessary.

In the present cases it seems clear that in addition to the express provisions and the intention of the Sioux treaty of 1868, the agreements and acts of February 28, 1877, March 2, 1889, supra, and the several acts under which the trust funds here involved arose, recognized and contemplated that the necessary Sioux agencies, agents and employees would be furnished and paid for by the United States, as had been the case theretofore, since the Government could only discharge the obligations assumed in the treaty, agreements and acts through such agencies, agents and employees. No express or implied provision is found in the treaty, agreements or acts to the effect that plaintiff should bear any of the agency expenses which were neces-

sary or incidental to the performance of obligations of the Government, and there were many such obligations which existed during the period in question.

In these circumstances the burden is on the Government, since the agencies are primarily its obligation, to satisfactorily show, if such be the fact, what portion of the total expenses of the agencies should not be assumed by it and be charged to the Indians as disbursements in payment of obligations of the Indians. We have no such proof in these cases. On the other hand plaintiff Indians in these cases have made out a prima facie case and have shown by a preponderance of the evidence that the agency expenses here in question represented obligations of the Government under the established Indian policy, the treaty of 1868, the agreement of September 26, 1876, and the agreement of March 2, 1889.

For the reasons hereinbefore stated and on the evidence submitted, we are of opinion that the above-mentioned items of this claim relating to agency expenses in the total amount of $688,195.80 (not including the item "Pay of farmers" in the total amount of $39,842.06) were expenses properly to be borne by the defendant; therefore, the disbursements made from plaintiff's trust funds in payment therefor were illegal. Recovery is therefore allowed for said amount of $688,195.80.

3. The item "Pay of farmers" is involved in cases 18, 19, 23, and 24, and the amounts disbursed to June 30, 1925, from the trust funds of the Indians on the Rosebud, Cheyenne River, and Standing Rock Reservations, as shown by defendant's accounting report, totaled $39,842.06 (see findings 9, 16, 56 and 77).

The question presented by this item of the claim is not whether defendant agreed and was obligated under the treaty of 1868, supra, to furnish and pay the farmers for which the questioned disbursements from trust funds were made, but is whether the expense or pay of such farmers (instructors to Indians engaged in farming) as were found necessary and furnished in addition to "a farmer" specified in the treaty was an obligation which the defendant assumed under art. 5 of the agreement and the act of February 28, 1877, 19 Stat. 254, to aid the Indians in the work of civilization and in becoming self-supporting. So far as appears, and plaintiff makes no contention to the contrary, the pay of "a farmer" referred to in the 1868 treaty has not been charged against the trust funds here involved. Plaintiff seems to contend that the farmer mentioned in the treaty of 1868 and such other farmers as were later found to be necessary, and were furnished, were agency employees, and that their compensation was an incidental agency expense which had been assumed by defendant.

Counsel for defendant contends that the farmers whose compensation is here involved were not provided or called for by the treaty; that they were furnished gratuitously by the Government for the benefit of plaintiff without obligation by treaty or otherwise, and, therefore, their compensation was in each instance a proper legal and equitable charge against the trust funds of the Indians of the Rosebud, Cheyenne River, and Standing Rock Reservations.

We are of opinion that the matter of furnishing and paying the compensation of the necessary farmers to instruct the Indians in farming or "in mechanical and agricultural arts" was an obligation assumed by defendant under the agreement and act of February 28, 1877, supra, and that plaintiff is entitled to recover the disbursements of $39,842.06 made from the trust funds for this purpose. This conclusion is supported by the language and intent of art. 5 of the act of February 28, 1877, and the other provisions thereof; the acts making appropriations to carry out art. 5 of the 1877 act; and the provisions of the act of March 2, 1889, 25 Stat. 888, particularly sections 17 and 19 thereof. There is nothing in the acts under which the trust funds arose to indicate anything to the contrary.

In art. 5, supra, defendant assumed, among others, three specific and definite obligations when it said that "In consideration of the foregoing cession of territory and rights, * * * the United States does agree to provide all necessary aid to assist the said Indians in the work of civilization; to furnish to them schools and instruction in mechanical and agricultural arts, as provided for by the treaty of 1868. Also to provide the said Indians with subsistence * * * until the Indians are able to support themselves."

The language of this article with reference to the matter of furnishing "all necessary aid to assist the said Indians in the work of civilization," and "instruction in mechanical and agricultural arts" was

much broader and more extensive than the limited provisions of the treaty of 1868, and we think the phrase "as provided for by the treaty of 1868," did not mean and was not intended to mean, as counsel for defendant seem to contend, that such aid, assistance, and instruction would be provided only to the extent and during the time specified in the treaty. On the contrary we think this phrase meant, and was intended to mean, *in the manner or of the character* provided in the treaty of 1868. The Indians obviously so understood the promise, otherwise there would have been no point to the making of such a promise. These were not empty words which meant no more than that the Government would fulfill its specific and limited obligations under the treaty in consideration of the valuable cessions being extracted from the Indians. What the Government subsequently did indicates that it did not understand the promise to be so limited. A promise so limited would not have been any consideration at all to the Indians. They already had that promise in the treaty and there had been no intimation by the Government that it would not be fulfilled. The treaty indicated rather clearly, as far as it went, the character and extent of aid and assistance that would be furnished, but its provisions limited the amount thereof because, at that time, it was not considered that more was needed. The treaty aid was limited to assistance by the agent and one farmer. However, when the agreement of 1877 was being made the situation was entirely different. It was then important that all necessary aid, assistance, and instruction in agriculture and the work of civilization be given, to the end that the Indians should become, as the act said, "self-sustaining," and "able to support themselves" and thereby end, or materially diminish, the Government's assumed obligation to furnish the necessary subsistence, industrial schools, and agricultural aid and instructions.

Our view as to the meaning of art. 5 is consistent with the view which Congress has taken concerning its meaning. In appropriation acts it was stated with reference .to art. 5 that the sums appropriated were "For subsistence of the Sioux, and for their civilization, as per agreement ratified by the Act" of February 28, 1877. One of the purposes of the act of March 2, 1889, 25 Stat. 888, was to carry out the purposes of and the obligations assumed by the Government and the Indians in the agreement ratified by the act of February 28, 1877.

Under art. 5, act of 1877, the compensation of such farmers (agricultural instructors) as were found to be necessary and were furnished was an obligation of defendant under the act of 1877 and should not have been paid out of the trust funds here involved. Plaintiff is therefore entitled to recover the amounts totaling $39,842.06, as shown in the findings.

4. The next item of the claim is for a total of $37,085.15 made up of items 15 to 24, amounting to $15,354.52 in case 18 (finding 9), and items 11 to 17, amounting to $21,730.63 in case 19 (finding 16). These amounts were disbursed for agency and educational expenses from the trust fund which arose under the acts of 1907 and 1910 from the sale of land belonging to the Indians on the Rosebud Reservation, and the several items are listed as to purposes and amounts in defendant's accounting report of its administration of this fund to June 30, 1925 under the dual heading "Agency and educational purposes," without indicating what portion of each of the amounts shown under each item was disbursed for agency expense and what portion was disbursed for educational expense and, also, without indicating the nature of the "educational purposes."

The items involved in case 18 are as follows:

| | |
|---|---|
| Provisions | $ 3,804.80 |
| Feed for livestock | 3,391.05 |
| Fuel | 6,312.21 |
| Traveling expenses of employees | 20.40 |
| Building materials | 215.00 |
| Repairs to agency and school buildings | 686.88 |
| Gasoline and Kerosene | 143.01 |
| Seeds for planting | 118.66 |
| Automotive maintenance and repairs | 358.01 |
| Refrigerators | 304.50 |
| Total | $15,354.52 |

The items involved in case 19 are as follows:

| | |
|---|---|
| Fuel | $ 2,732.90 |
| Transportation, etc., of supplies | 12,790.23 |
| Feed for livestock | 87.50 |
| Heaters, water-tank | 55.00 |
| Agricultural implements | 549.11 |
| Seeds for planting | 35.89 |
| Pay of superintendent | 5,480.00 |
| Total | $21,730.63 |

■ We have held hereinbefore that on the evidence of record the costs and expenses for provisions, pay of agency employees, and all other necessary agency

expenses and the pay and expenses of farmers were obligations of the defendant under the treaty of 1868 and the acts and agreements of 1877 and 1889, and, should not have been paid for by disbursements from the trust funds. Therefore, it is obvious from these and other undertakings of defendant as to schools and education, and from the description of the purposes for which the disbursements now being considered were made, that all the amounts shown were in discharge and payment of obligations which rested upon defendant. Counsel for defendant contend that plaintiff's claim in respect of the items totaling $37,085.15, hereinabove set out, should be altogether denied for want of sufficient proof to show which or what portion of each of the items was for obligations of the Government. The first argument of defendant is that all these disbursements were proper and legal charges against the trust fund as expenditures for the benefit of the Indians. This of course is not true to the extent that the disbursements were for purposes which represented obligations of the Government, and we have held that the agency expenses and expenses for mechanical and agricultural aid and instructions were such obligations.

▮▮▮ Defendant next argues that in this voluminous accounting with respect to the claims made in the original and amended petitions it could not be expected and was not required to detail with exactness the purposes and amounts of the many disbursements which had been made from plaintiff's trust funds, and that the duty and burden rested on plaintiff to prove such details. The totals of the listed items shown by the records to have been for agency purposes should have been set up in the report under that classification and the totals of the various disbursements shown by the records to have been items of the same character but for elementary or industrial education should have been set up under that classification so that the court might decide whether, under the agreements and undertakings of the parties, the amounts under those classifications were, in whole or in part, legal charges against the trust funds or for obligations of the defendant. The primary duty to so classify and report as to the nature and the amount of disbursements rested on defendant.

▮▮▮ Since the Government obligated itself in the treaty and the agreements of 1868, 1877, and 1889 to provide agen-

cies, aid and assistance, schools, and instruction, the burden is on defendant to show what portion, if any, of such expenses has not been assumed by it and should be charged to the Indians. The Government cannot escape its primary obligations by including, among improper charges against the Indians, expenditures which it now says, without proof, may have been to some unknown and unascertainable extent proper charges against the Indians. The defendant is the trustee; it kept and has all the records and evidence, and it has the burden of making a proper accounting. However, we need not further discuss the accounting report for we are of opinion, from the evidence of record and the way in which Congress has treated these educational expenses, that all the agency and educational items and amounts involved in this claim were for obligations of defendant.

In the decision herein on claims 2 and 3 relating to "agency expenses" and "pay of farmers" we have discussed the nature and extent of some of the obligations which the United States assumed under the treaty of 1868 and the agreement of September 26, 1876, act of February 28, 1877, 19 Stat. 254, and the act and agreement of March 2, 1889, 25 Stat. 888; the reasons so given in support of the conclusion that agency and industrial educational expenses were obligations of the Government are applicable to the various items of the claim here under consideration.

The agreement of 1876, set forth in the act of February 28, 1877, supra, provided for schools and for industrial education and instruction, and sec. 17 of the act and agreement of March 2, 1889, supra, which was in furtherance of the general educational obligations assumed by the Government under the agreement and act of 1877, provided as follows: "That it is hereby enacted that the seventh article of the said treaty of April twenty-ninth, eighteen hundred and sixty-eight, securing to said Indians the benefits of education, subject to such modifications as Congress shall deem most effective to secure to said Indians equivalent benefits of such education, shall continue in force for twenty years from and after the time this act shall take effect; * * *."

The first appropriation providing funds for educational purposes under section 17 of the act of March 2, 1889, quoted above, was approved January 19, 1891, 26 Stat. 720, 721 and provided as follows: "For the

erection of day and industrial schools, providing furniture and other necessary articles, and pay of teachers, in accordance with article seven of the treaty of April twenty-ninth, eighteen hundred and sixty-eight, which said article of treaty is continued in force for twenty years by section seventeen of the above-mentioned act of March second, eighteen hundred and eighty-nine: *Provided,* That as fast as school facilities are furnished the Secretary of the Interior is hereby authorized and required to compel all children between the ages of six and sixteen to attend the schools on the reservation at least nine months in the year, except such as may be attending school elsewhere, one hundred and fifty thousand dollars."

The next appropriation act approved July 13, 1892, 27 Stat. 132 reads in part: "For support and maintenance of day and industrial schools, including erection and repairs of school buildings, in accordance with article seven of treaty of April twenty-ninth, eighteen hundred and sixty-eight, which article is continued in force for twenty years by section seventeen of the act of March second, eighteen hundred and eighty-four [nine], one hundred and fifty thousand dollars; * * *."

Thereafter appropriations were made annually from 1893 to 1909 providing funds for educational purposes to include the fiscal year ending June 30, 1910. Each of these appropriations was by a provision the same as that of July 13, 1892, quoted above.

The Indian Appropriation Act of April 4, 1910, 36 Stat. 269, 284, for the fiscal year ending June 30, 1911, and each annual Indian appropriation act thereafter, to and including the appropriation for the fiscal year ending June 30, 1916 (see Joint Resolution, March 4, 1915, 38 Stat. 1228), continued in force as an obligation of the Government the educational provisions for day and industrial schools of sec. 17 of the act and agreement of March 2, 1889, supra. This action was pursuant to and in accordance with art. 5 of the agreement approved by the act of February 28, 1877, supra. The extension provision which appeared in the appropriation act of April 4, 1910, and in each subsequent appropriation act to 1915, inclusive, was as follows: "For support and maintenance of day and industrial schools among the Sioux Indians in South Dakota, including the erection and repairs of school buildings, two hundred thousand dollars, to be expended under the

agreement with said Indians in section seventeen of the Act of March second, eighteen hundred and eighty-nine, which agreement is hereby extended to and including June thirtieth, nineteen hundred and eleven."

Although the provisions in the appropriation act of 1910 to 1915, inclusive, did not mention art. 7 of the 1868 treaty, this was not necessary because the Government's obligation to continue to provide "schools and instruction * * * as provided for by the treaty" of 1868 arose under art. 5 of the agreement of September 26, 1876, ratified in the act of 1877, and sec. 17 of the agreement of 1889 providing for such "day and industrial schools" for a period of twenty years, or until February 10, 1910, was, by such subsequent acts, continued in full force and effect from year to year, to and including June 30, 1916. The substance of art. 5 of the agreement of 1877 for elementary and industrial education (referred to in the appropriation acts as "day and industrial schools") was written into sec. 17 of the act of March 2, 1889, to satisfy the Indians. This was made certain by the act of May 18, 1916, 39 Stat. 123, 151, making appropriations "for fulfilling treaty stipulations with various Indian tribes, and for other purposes" which provided that the appropriation for "day and industrial schools" was pursuant to art. 5 of the agreement of September 26, 1876, as follows: "For support and maintenance of day and industrial schools among the Sioux Indians, including the erection and repairs of school buildings, $200,000 in accordance with the provisions of article five of the agreement made and entered into September twenty-sixth, eighteen hundred and seventy-six, and ratified February twenty-eighth, eighteen hundred and seventy-seven."

Each annual appropriation act subsequent to the act of May 18, 1916, contained the identical provision above quoted for the period here involved to June 30, 1925.

Under the treaty of 1868, the agreements of 1877 and 1889, and the provisions of the appropriation acts above mentioned, the questioned items, totaling $15,354.52 in case 18 and $21,730.63 in case 19, listed in the accounting report as for "agency and educational purposes," were improper and illegal charges against the trust funds of the treaties concerned. Judgment will therefore be entered in favor of plaintiff for the amounts mentioned.

5. The next question presented is whether plaintiff is entitled to recover in cases 18, 23, and 24 a total $3.650.50 representing disbursements of $180 in case 18, $1,717.75 in case 23, and $1,752.75 in case 24 from trust funds as prizes to Indians for State Fair Exhibits. These items are shown in findings 9, 56, and 77.

Plaintiff argues that inasmuch as defendant offered the prizes it did not have the right or authority to pay them out of trust funds of the Indians. Plaintiff cites no facts or authority to show that defendant, when acting in its capacity as trustee for the Indians, might not offer and pay prizes to individual Indians of the tribe out of the tribe's funds when it deemed that to be in the interest and for the benefit of the tribe. The defendant did not offer these prizes in its sovereign capacity but as the trustee for the Indians of the tribe, and they were offered and paid on behalf of the tribe to encourage the members of the tribe in proficiency in industry, agriculture, and stock raising. The disbursements were for the benefit of the tribe which, under the agreements of February 28, 1877, and March 2, 1889 had assumed an obligation to become self-sustaining as soon as practicable.

Plaintiff is not entitled to recover on this claim.

6. The next claim, likewise involved in cases 18, 23, and 24, is for a total of $83,573 consisting of $2,683 in case 18; $24,500 in case 23, and $56,390 in case 24. These amounts represent disbursements by defendant from the trust funds of the Rosebud, Cheyenne River, and Standing Rock reservations for the cost of replacing stock, belonging to certain of the Indians on these reservations, which had to be killed on account of and to prevent the spread of disease (see findings 9, 56 and 77). Plaintiff contends that defendant ordered this stock destroyed and therefore should have borne the cost of replacing it. It is not denied that the stock killed was afflicted with a contagious disease and that it was necessary to destroy it in order to prevent the disease from spreading to other stock. Plaintiff contends that it had been the policy of the United States in other instances to make compensation from public funds to the owner of the stock destroyed; that the compensation in these instances should have been paid out of public funds and not out of funds of the tribe, and that such use of the trust funds did not constitute payment but was an improper transfer of such funds. Plaintiff further contends that these disbursements were for the benefit of individual Indians whose stock had to be destroyed, rather than for the tribe, and were improper for that reason.

The statutes under which these trust funds arose authorized their use for the benefit of the Indians under direction of the Secretary of the Interior, and we think this was such a use. In destroying the stock and paying for its replacement out of tribal funds the Government was acting as the trustee for the Indians having the duty of controlling and managing their funds and property for their benefit. The defendant was under no legal duty or obligation to use public funds to replace the destroyed stock when the tribes of these reservations had tribal funds of their own. This was not a governmental expense which defendant was obligated to bear in its sovereign capacity, and it had not assumed such an obligation by treaty or agreement. The fact that Congress has in certain instances (see Appropriation Acts of May 10, 1926, and January 12, 1927), 44 Stat. 453, 462; 934, 942, used public funds to reimburse Indians for the destruction of stock infected with a contagious disease and for the expense of the work of eradicating and preventing such disease does not establish that the cost of replacing stock so destroyed is a legal and enforceable obligation or expense of the Government in every instance. United States v. McDougall's Administrator, 121 U. S. 89, 96, 7 S.Ct. 850, 30 L.Ed. 861. The power unquestionably resides in the Government to use tribal funds for this purpose or to make reimbursable public funds so used. The cost of replacing stock so destroyed, whether paid out of tribal or public funds, is an expenditure for the benefit of all members of the tribe concerned. When the stock of one or several Indians is destroyed in order to prevent the contagious disease from spreading to the stock of all other members of the tribe, the cost of replacement is an expenditure which may properly be regarded as one for the benefit of the tribe.

Plaintiff is therefore not entitled to recover on this claim.

7. The next claim, involved in cases 20 and 23, relates to alleged illegal expenditures of $18,173.79 in case 20 (finding 21) for public bridges, and $3,360 in case 23

(finding 48) totaling $21,533.79. These expenditures and transfers were made by the Secretary of the Interior from tribal funds under authority of the act of February 14, 1920, 41 Stat. 408, 429, in case 20, and the act of June 23, 1910, 36 Stat. 602, in case 23.

Pursuant to direction of the 1920 act the amount of $3,000 was paid to the State Highway Commission of South Dakota to cover a portion of the cost of building a bridge across White River, described as the White River Bridge, which was located on the Pine Ridge Reservation; the amount of $15,060 was paid to the Monarch Engineering Company, Falls City, Nebraska, for the cost of constructing a concrete and steel bridge across the White River within the Pine Ridge Reservation, and $113.79 was paid for expense of advertising for bids for the construction of said bridge.

Pursuant to the 1910 act the amount of $2,480 was transferred from the trust fund to a fund entitled "Public Buildings, Improvements, etc., Isabel, South Dakota," and was paid to the town of Isabel, November 12, 1913; $880 was transferred to a fund entitled "Public Buildings, Improvements, etc., Arrowhead, South Dakota," and was paid Zieback County School, District 14, on May 13, 1914.

With reference to expenditures for the bridges, plaintiff contends that the provisions of the act of February 14, 1920, which authorized and directed the use of tribal funds in that connection, constituted a breach of trust because the bridges, although within the Pine Ridge Reservation, were on public highways, were public bridges, and should have been paid for by defendant at public expense.

With reference to the contribution from tribal funds to town buildings and schools within the reservation the act of June 23, 1910, supra, enacted in the interest and for the benefit of the Indians concerned, directed the Secretary of the Interior to sell the town sites of Isabel and Arrowhead, S. D., and to "cause at least twenty per centum of the net proceeds arising from the sale of the lands herein provided for to be set apart and expended under his direction in the construction of school houses and other public buildings or in improvements in the respective townsites." The net proceeds were deposited in tribal funds and the amounts of $2,480 and $880 were transferred to the accounts mentioned and expended for the purposes specified.

Plaintiff contends that these disbursements for bridges and buildings were pure gifts by the Government and constitute misappropriations of tribal funds, and that the act of 1910 is void because "it directs what could be a complete confiscation of all funds derived from the sale of the two townsites."

Nothing has been presented to show that Congress exceeded its authority in directing the use of certain amounts of tribal funds for the purposes indicated. The history of the act shows that Congress considered that the sale of the townsites and the contribution to schools, etc., would be to the interest of the Indians. Osage Tribe of Indians v. United States, 102 Ct.Cl. 545, 552–554.

Plaintiff is not entitled to recover on any of the items of this claim.

8. The next claim, in case 22, is for just compensation of $560,254.75 ($25 an acre for certain land) with interest from April 21, 1906, for alleged "misappropriation" by defendant of 34,664.62 acres of land, which under sec. 5 of the act of March 2, 1889, 25 Stat. 888, was intended to be and should have been included in the Lower Brulé Reservation, which was one of the several reservations created out of the Great Sioux Reservation as defined by the treaty of 1868 and the act of February 28, 1877, supra (see findings 4, 33, 37).

The reservation known as the Lower Brulé Reservation for the Indians of the Sioux Tribe receiving provisions and annuities at the Lower Brulé Agency, as defined by sec. 5 of the act of 1889 and as actually surveyed in 1890, was a part of the Great Sioux Reservation. What happened was that by an erroneous survey of the Lower Brulé Reservation under the act of 1889 3,763.55 acres of the main Sioux Reservation were erroneously included and 34,664.62 acres of such main reservation were erroneously excluded. Apparently the 34,664.62 acres were subsequently sold and the proceeds credited to the Sioux Tribe. See case C–531 (11) decided this date. 64 F.Supp. 303. No claim with reference to this matter was made on behalf of the Lower Brulé Indians in the original petition, and the amended petition, No. 23, filed on behalf of this Cheyenne River Tribe or Band, first asserted this claim for just compensation. Apparently the matter was not thought of until plaintiff saw mention of the erroneous survey in the report of the General Accounting Office.

The amended petition was filed more than five years after approval of the jurisdictional act. We are therefore without jurisdiction of this claim by the Lower Brulé Indians. It may be stated, however, that as a matter of fact it does not appear that any portion of the 34,664.62 acres, or any of the money received therefrom, has been taken or misappropriated by defendant to its own use.

Plaintiff is not entitled to recover on this claim.

9. The next claim is in case 23, and involves $2,361.45 which represents the amount which defendant agreed to pay but which it has not paid for 944.56 acres of land of the Indians of the Cheyenne River Reservation, representing a part of the land granted to the State of South Dakota for school purposes by the act of May 29, 1908 (findings 43 and 44). A similar item in the amount of $336.83 is shown by finding 61 in favor of the Indians in case 24 (Standing Rock). Plaintiff is entitled to recover the amount of $2,361.40 in case 23 and $336.83 in case 24.

10. The next claim is made in each of the cases 20 to 24, inclusive, and involves a total of $2,103,165.07 which is made up of the amounts shown in defendant's accounting report as the unexpended balances remaining in the principal and interest trust fund accounts on the books of the Treasury at the close of the fiscal year ending June 30, 1925, which was the end of the periods covered by the accounting report.

These several amounts, and the cases in which involved, are as follows:

The preparation of the detailed accounting report of seven large volumes was a difficult task and required a great amount of time and effort. The work of compiling it from the original credit and disbursement vouchers, accounting records, treaties, agreements, and acts of Congress required a period of nearly nine years, and this work was thoroughly and painstakingly done. Congress made special appropriations for the purpose. Of necessity, some date had to be selected by the Comptroller General as the end of the period to be covered by the accounting with respect to the many matters and questions raised by plaintiffs' original petition. The original petition was filed May 7, 1923, and the Comptroller General selected June 30, 1925 (the end of that fiscal year) to fix the period to be covered by that accounting report. The period allowed by the jurisdictional act for filing suit on all claims to be presented for determination expired June 3, 1925. See United States v. Seminole Nation, 299 U.S. 417, 57 S.Ct. 283, 81 L.Ed. 316. The report covering all financial and accounting transactions with the Sioux Indians to July 1, 1925, was completed, certified, and delivered to defendant April 12, 1932, and a complete copy thereof was delivered to plaintiffs' counsel April 19, 1932.

Plaintiff does not ask that final judgments be now entered for the amounts of the balances shown, but contends that since it was the duty of defendant under the allegations of the original petition to make a complete accounting with reference to these and other trust funds, and such accounting has not been rendered subsequent to June 30, 1925, judgments should be en-

| Case | Reservation | Account | Balances | Finding |
|---|---|---|---|---|
| 20 | Pine Ridge | Principal | $193,052.47 | 19 |
| | | Interest | 27,586.65 | 20 |
| 21 | Crow Creek | Principal | ·4,679.49 | 27 |
| | | Interest | 2,151.44 | 29 |
| 22 | Lower Brule | Principal | 4,775.47 | 35 |
| 23 | Cheyenne River | Principal | 1,681,601.55 | 54 |
| 24 | Standing Rock | Principal | 189,318.00 | 75 |

tered that plaintiff is entitled to recover with respect to the balances and that further proceedings should be had under Rule 39 (a) to determine, on further accounting, the exact amounts, if any, for which final judgments should be entered. In other words plaintiff says that after we have decided the issues presented we should order a further accounting as to the balances and allow plaintiff another opportunity to raise further issues if it should so desire.

There must be an end to the cases. We cannot keep them open indefinitely for plaintiff's convenience in order that it may have several trials and decisions in each case as to its legal right to recover on the issues presented and which may be later presented before closing the cases on final accounting as to the offsets, if any, against such amounts as may be due under the decision on the issues presented when the cases were prepared, argued and submitted. Rule 39 (a) was not intended to authorize or provide for several trials on questions as to legal rights of an Indian Tribe to recover, or to permit piecemeal trials in chief. Plaintiff knew when it received the accounting report on April 19, 1932, that the accounting ended on June 30, 1925, and no mention was made of the matter until the briefs in the seven cases were filed. The cases were argued and submitted on the specific issues decided herein, and if plaintiff believes that it has other or further claims it must petition Congress for relief or for further permission to sue thereon. Plaintiff has had its day in court as to the right of recovery on all issues which it saw fit to raise, prepare and submit for decision. The time has passed for asking for a remand for a further or supplemental accounting on matters concerning questions required to be tried and submitted in the first trial under Rule 39 (a). Cf. Cherokee Nation v. United States, 102 Ct.Cl. 720, 760.

Plaintiff has not shown that it is entitled to recover any amount with respect to the balances on June 30, 1925, in the total amount of $2,103,165.07 as above itemized in five cases, 20 to 24, inclusive.

Under the findings and the foregoing opinion plaintiff is entitled to recover a total of $1,591,704.62 as principal, made up of the items and the amounts as follows:

| Case No. | Issue involved | | |
|---|---|---|---|
| 18 | Provisions ......... | $324,530.12 | |
| | Agency expense and pay of farmers.. | 207,462.96 | |
| | Combined agency and educational expenses ........ | 15,354.5 | |
| | Total ........... | ............ | $547,347.60 |
| 19 | Provisions ......... | 82,135.03 | |
| | Agency expense and pay of farmers.. | 94,458.22 | |
| | Combined agency and educational expenses ........ | 21,730.63 | |
| | Total ........... | ............ | 198,323.88 |
| 20 | No recovery allowed. | | |
| 21 | Provisions ......... | 10,526.51 | |
| | Agency expense.... | 12,821.14 | |
| | Total ........... | ............ | 23,347.65 |
| 22 | No recovery allowed. | | |
| 23 | Provisions ......... | 200,569.96 | |
| | Agency expense and pay of farmers.. | 205,519.33 | |
| | Shortage in payment for school land ............. | 2,361.40 | |
| | Total ........... | ............ | 408,450.69 |
| 24 | Provisions ......... | 206,121.76 | |
| | Agency expense and pay of farmers.. | 207,776.21 | |
| | Shortage in payment for school land ............. | 336.83 | |
| | Total ........... | ............ | 414,234.80 |
| | Grand total .... | ............ | $1,591,704.62 |

11. The next question is the amount of interest, if any, to which plaintiff is entitled on the amount allowed as a recovery in each case as above stated.

 No interest is allowable in case 18. The only portion of the net proceeds derived from sales of land under the act of March 2, 1907, which carried interest of 3 percent was the fund of $1,000,000 set up on December 3, 1910, for a period of ten years pursuant to sec. 5 of that act. Upon the expiration of this 10-year period in December 1920 the principal of this fund was disbursed in per capita payments.

 Sec. 7 of the act of May 30, 1910, under the provisions of which the net interest-bearing trust fund of $613,985.33

in case 19 was created, provided for the deposit, as received, of the proceeds from the sale of land and the payment of interest at 3 percent per annum thereon. The first deposit to the credit of the Indians was $125,000 paid by the United States for school lands on May 31, 1910; the second deposit was on January 2, 1912, representing the first receipts from entrymen. Other deposits were made as received from time to time to and including June 30, 1925. During the fiscal years ending June 30, 1919 to 1925, inclusive, disbursements which included those in respect of which a recovery of $198,323.88 is allowed, were made from this interest-bearing fund. The facts set forth in the findings as to the items of receipts and disbursements and the dates and amounts thereof are taken from evidence submitted by defendant and are as found by the Commissioner of this court. Neither party has taken exception thereto and plaintiff has not in connection with its claim for interest furnished the court with any information showing the amounts of the annual disbursements in respect of the questioned items, on some of which recovery has been allowed. It appears, however, that disbursements for the purposes which we have held were unauthorized were fairly uniform over the period of such disbursements from 1919 to 1925, and we therefore fix the date of July 1, 1922, to equate the dates of disbursements in the total amount of $198,323.88 allowed in favor of plaintiff for the purpose of computing allowable interest of 3 percent thereon. This method of fixing the beginning of the interest period was approved in John M. Enright et al. v. United States, 73 Ct.Cl. 416, 438; and National Electric Signaling Co. et al. v. United States, 99 Ct.Cl. 621, 642, 646. Such interest at 3 percent from June 30, 1922 to January 7, 1946, inclusive, is $139,932.52.

In case 21 the facts and the provisions of the act of May 27, 1902, 32 Stat. 245, 267, show that of the principal amount of $187,039.00 which bore interest at 4 percent per annum, the amount of $168,335.10 thereof was on deposit on May 2, 1902, and that this entire amount was disbursed shortly after May 27, 1902, for purposes other than those for which the amounts allowed as a recovery were disbursed. The difference of $18,703.90 of this interest-bearing fund was expended for attorney's fee (see findings 27 and 28). No interest is therefore allowed on the judgment of $23,347.65 in this case.

The interest-bearing trust fund in case 23 arose under the act of May 29, 1908, sec. 6 of which provided that the proceeds from the sale of lands be deposited to the credit of the Indians and should bear interest at 3 percent per annum. This section further provided that the moneys derived from the sale of such land be expended for the benefit of the Indians under direction of the Secretary of the Interior. The interest-bearing trust fund principal in the total amount of $2,586,759.59, was made up of deposits over the period June 30, 1910, to June 30, 1925, inclusive. During the same period various disbursements, which included those in respect of which a recovery of $408,450.69 is allowed, were made from this fund. For the reasons above stated in case 19, we allow plaintiff interest at three percent on the amount of this judgment in case 23 from December 31, 1917 to January 7, 1946. Such interest amounts to $343,333.56.

In case 24, as in case 23, the trust fund from the sales of land under the act of May 30, 1910, bore interest at 3 percent per annum. It was created by deposits over the period June 30, 1910 to June 30, 1925, inclusive. The disbursements in respect of which recovery has been allowed in the total amount of $414,234.80 above stated were made therefrom during the same periods. Interest at 3 percent per annum is therefore computed and allowed thereon from December 31, 1917 to January 7, 1946. This interest amounts to $348,195.45.

Plaintiff is therefore entitled to recover for principal and allowable interest a total of $2,423,166.15 in five of these seven cases in the respective amounts of $547,347.60 in case 18; $338,256.40 in case 19; $23,347.65 in case 21; $751,784.25 in case 23, and $762,430.25 in case 24. Plaintiff is not entitled to recover in cases 20 and 22.

## OFFSETS

Under the facts stated in finding 80 and the tabulation set forth therein of gratuitous expenditures from public funds by defendant to June 30, 1925, under the act of March 2, 1889, 25 Stat. 888, for benefit of the Indians of the Sioux Tribe on the Pine Ridge, Rosebud, Standing Rock, Cheyenne River, Crow Creek, and Lower Brulé

reservations, after their proportionate part of the permanent fund under the agreement of March 2, 1889, 25 Stat. 888, had been exhausted, the defendant is entitled to credits or offsets, from the excess gratuitous expenditures so made against the Indians of the plaintiff Sioux Tribe on the reservations mentioned in the amounts equal to the judgments hereinabove mentioned in Cases C–531 (18), (19), (21), (23) and a part of the judgment in case (24) as follows:

1916 to June 30, 1925; $283,974.58 in C–531 (21), Crow Creek Reservation, expended 1913 to June 30, 1925; $248,757.30 in C–531 (22), Lower Brulé Reservation, expended 1903 to June 30, 1925; $14,930.53 in C–531 (23), Cheyenne River Reservation, expended in fiscal year 1925; and no amount remains unused in C–531 (24), Standing Rock Reservation.

Plaintiff is not entitled to judgment in any of the seven cases C–531 (18) to (24), inclusive, on behalf of any of the Sioux

| Year | C-531 (18) (19) Rosebud | C-531 (21) Crow Creek | C-531 (23) Cheyenne River | C-531 (24) Standing Rock |
|---|---|---|---|---|
| 1914 | | $23,347.60 | $163,375.63 | |
| 1915 | | | 127,540.23 | $3,797.94 |
| 1916 | $73,017.24 | | 68,700.69 | 93,073.75 |
| 1917 | 108,042.79 | | 31,559.33 | 56,596.58 |
| 1918 | 163,727.41 | | 60,002.35 | 76,225.08 |
| 1919 | 134,667.00 | | 45,778.47 | 70,824.91 |
| 1920 | 104,520.51 | | 72,924.43 | 60,390.09 |
| 1921 | 185,245.70 | | 60,081.26 | 83,186.74 |
| 1922 | 116,383.35 | | 41,294.27 | 110,366.85 |
| 1923 | | | 35,113.35 | 88,076.66 |
| 1924 | | | 29,532.06 | 32,894.94 |
| 1925 | | | 15,882.18 | 76,547.31 |
| Total | 885,604.00 | 23,347.60 | 751,784.25 | 751,980.85 |
| Gratuitous expenditures from finding 81 | | | | 10,449.40 |
| Total | | | | 762,430.25 |

Of the several amounts of gratuitous expenditures tabulated and totaled in finding 80, the following amounts remain unused as offsets after deducting the credits and offsets above stated: $364,671.18 in C–531 (18) and (19), Rosebud Reservation, expended 1922 to June 30, 1925; $1,566,056.55 in C–531 (20), Pine Ridge Reservation, expended

Indians concerned, and the petitions are dismissed. It is so ordered.

JONES and WHITAKER, Judges, concur.

MADDEN, Judge, and WHALEY, Chief Justice, took no part in the decision in these cases.